CHICAGO, M. & ST. P. RY. CO. et al. v. DES MOINES UNION RY. CO. et al.

DES MOINES UNION RY. CO. et al. v. CHICAGO, MILWAUKEE & ST. P. RY. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. May 23, 1918. Rehearing Denied October 28, 1918.)

Nos. 4885, 4886.

1. RAILROADS ⬥80—TERMINAL PROPERTY—CONVEYANCE TO TERMINAL COMPANY.

Articles of incorporation of a terminal railroad company, organized by three railroad companies, each of which owned property and franchises in a city, to take over and operate such property for terminal purposes, construed in connection with a prior contract between the railroad companies for joint use of the property, and with subsequent conveyances of the same to the terminal company in exchange for its bonds, *held* to vest the latter with the entire legal title, leaving the interest of the railroad companies therein only that represented by their stock.

2. RAILROADS ⬥118—POWER TO TRANSFER PROPERTY—CONVEYANCE TO TERMINAL COMPANY.

The rule that public carriers may not impair their public usefulness by vitally maiming their lines has no application to conveyances by railroad companies of terminal portions of their lines to a terminal company, whereby a more efficient and economical operation of the property is secured.

3. RAILROADS ⬥19—ILLEGAL AMENDMENT OF CHARTER—ESTOPPEL.

Where an amendment to the articles of incorporation of a terminal company, although not legally adopted, was acquiesced in by the parties in interest all of whom took part in its adoption, and was treated as valid and in force for 17 years, during which time some acquired additional interests from others, the latter are, as between them, estopped to question the validity of the amendment.

4. RAILROADS ⬥139—CONTRACTS WITH TERMINAL COMPANY—CONSTRUCTION.

Under contracts between three railroad companies and a terminal company organized by them, providing that, after deducting the amount received from other companies for use of the terminal property, the cost of its maintenance and operation should be paid monthly by the three companies, such companies *held* entitled to a surplus accumulated by the terminal company from sums so received from outside companies for rentals and switching charges and not applied on cost of maintenance and operation all of which was charged to and paid by the three companies.

Hook, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Southern District of Iowa.

Suit by the Chicago, Milwaukee & St. Paul Railway Company and others against the Des Moines Union Railway Company and others. From the decree, both parties appeal. Modified.

Burton Hanson, of Chicago, Ill. (J. C. Cook, of Cedar Rapids, Iowa, on the brief), for complainant Chicago, M. & St. P. Ry. Co.

J. L. Minnis, of St. Louis, Mo., for complainant Wabash R. Co.

J. L. Parrish, of Des Moines, Iowa, and F. W. Lehmann, of St. Louis, Mo. (W. E. Miller, of Des Moines, Iowa, on the brief), for defendants.

Before HOOK, SMITH, and STONE, Circuit Judges.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

STONE, Circuit Judge. This is a bill by the Chicago, Milwauk & St. Paul Railway Company and the Wabash Railroad Comp: against the Des Moines Union Railway Company, Frederick M. H bell, Frederick C. Hubbell, and F. M. Hubbell & Son. The comple ants are railways passing through the city of Des Moines, requir the use of terminal and depot facilities. Defendants are a term company at Des Moines and the individual owners of five-eighth its outstanding capital stock. Complainants, except for eight qu fying shares, own the other three-eighths of such stock, the bash one-eighth, and the Milwaukee two-eighths. Complainants a. now using the facilities of the terminal company under a 30-year contract, dated May 10, 1889, but related back to May 1, 1888, and expiring May 1, 1918. As holders of the stock control in the terminal company, the Hubbells have declared that, if complainants desire to use the terminals after the above date, they can do so only under such contract as may be made therefor. Believing that they have (aside from stock holdings) controlling interests and rights in the terminal property, complainants have brought their bill. The main object of the suit is to have determined the rights of the three companies in respect to the terminal property and operation. A subsidiary, but not unimportant, controversy is present regarding the right to several hundred thousand dollars accumulated from rentals, privileges and switching service by the terminal company, not arising from the use by nor service to the complainants.

The complainants allege that they are the real owners of the terminal property, and that defendant company simply holds the title in trust for them, or that the terminal ownership is subject to an easement in their favor, which gives them the right to use the property in perpetuity for terminal purposes, upon payment of the actual cost of operation, maintenance and taxes. The claim of the defendants is that the defendant company is the sole owner of the entire title to the terminal property, and also that complainants are estopped from questioning such title.

The decree of the court below adjudged that the defendant company had complete title to the terminal property, and that complainants had no interest therein, except as stockholders of the defendant company. But the court held that, growing out of provisions in that company's articles of incorporation, it owed to complainants and their successors a corporate obligation to furnish them terminal service upon equitable terms, and that such obligation was paramount to any obligation to serve other roads. From this latter provision in the decree defendants have prosecuted a cross-appeal. As to the accumulated earnings, the court below held that this fund belonged to the defendant company, and that the complainants had no interest therein, other than as shareholders in the defendant company. Complainants have appealed from the entire decree.

The determination of the main controversy is the definition of the legal effect of certain instruments and acts of the parties or their predecessors in interest. The determination of the right to the ac-

cumulated earnings depends upon the construction of the contract (dated May 10, 1889) under which the parties are now operating.

## The Main Controversy.

[1] A brief history is essential to any proper understanding and determination of the case. As to that part of their respective railways entering Des Moines, the Milwaukee is the remote successor of the Des Moines Northwestern Railway Company and the St. Louis, Des Moines & Northern Railway Company, while the Wabash is the remote successor of the Des Moines & St. Louis Railway Company. Prior to 1881 the Wabash, St. Louis & Pacific Railway Company was the owner of a railway line extending from St. Louis northwesterly to Albia, Iowa, about 68 miles southeasterly from Des Moines. J. S. Polk, J. S. Clarkson, F. M. Hubbell, and J. S. Runnells were at the same time interested in a short narrow-gauge line, the Des Moines Northwestern Railway Company, extending northwesterly from Waukee, a town about 15 miles westerly from Des Moines. Desiring to connect these lines at Des Moines, the Wabash and the above individuals entered into a contract December 8, 1880, providing for the organization by these individuals of a new company, the Des Moines & St. Louis Railway Company, and the building by it of a standard-gauge line from Albia to Des Moines, with funds furnished by the Wabash Company. On the same day the Wabash Company entered into contract with the Des Moines Northwestern Railway, with the expressed object of increasing and securing the "through" traffic of that line. This it sought to do by agreeing to furnish funds for the extention of that line northward and westward, and by agreeing to provide a connection from Waukee with the contemplated Des Moines & St. Louis Railway tracks to be laid in Des Moines. In April, 1881, yet another company, the St. Louis, Des Moines & Northern Railway Company, was organized by the above individuals, and soon began constructing a narrow-gauge line from the northwest to Des Moines. A part of this line formed a link between Waukee and Des Moines, over which the Northwestern shortly thereafter secured running rights.

During the year 1881 and thereafter, the acquirement of right of way in Des Moines and the construction work there proceeded; the land being taken in the name of James F. How, James F. How, trustee, G. M. Dodge, St. Louis, Des Moines & Northern Railway Company, or the Des Moines & St. Louis Railway Company; that taken by How, or How, trustee, being paid for by the Wabash.

With the three lines entering or about to enter Des Moines and the land being acquired for terminals, the time and necessity for some terminal arrangement had arrived. The contract of January 2, 1882, was executed by the three railways and by the individuals (Dodge and How) in whose names part of the land had been taken. This contract is the basis of complainants' claims upon the main issue in the case. They contend that titles and rights defined therein remain unchanged

in essentials. Defendants claim later departures radically affected such titles and rights as are to be found in the contract.

. This contract, omitting signatures, was as follows:

"This agreement, made at the city of New York, the 2d day of January, 1882, by and between the Des Moines & St. Louis Railway Company, the Des Moines Northwestern Railway Company, and the St. Louis, Des Moines & Northern Railway Company, and the several individual signers hereto, witnesseth:

"First. The companies above named are engaged in the construction of railways converging at the city of Des Moines, and have heretofore agreed upon the purchase, construction and maintenance at their joint expense for terminal facilities in the city of Des Moines to be held and used in common as hereinafter provided.

"Second. In pursuance of said agreement, various purchases have been made of real property in the city of Des Moines in the name of James F. How, individually, James F. How, trustee, and Grenville M. Dodge, and certain additional property has been appropriated by the Des Moines & St. Louis Railway Company, and the construction of buildings and other improvements upon said premises has been begun.

"Third. It is mutually, agreed by the parties above named, that the expense incurred in the purchases and improvements above mentioned and such others as may be hereafter made, shall be borne in the proportion of one-half by the Des Moines & St. Louis Railway Company and one-quarter by each of the other two companies above named. It is understood that a depot company may be organized and may take permanent charge of the property upon the terms herein set forth, and that said company may issue and deliver to the companies, parties hereto, its mortgage bonds to the amount of their respective portions of the cost of the said purchases and improvements.

"Fourth. The title to said property shall be and remain in a trustee to be named by agreement by said companies, but subject to the joint use and occupation of all of said railway companies upon the terms herein described.

"Fifth. The individual signers hereto hereby declare said purchases to have been made in their names upon the trusts above referred to, and agree to quitclaim and convey the same to said trustees upon demand and reimbursement.

"Sixth. The Des Moines & St. Louis Company shall at all times be charged with the police control, supervision and maintenance of said property, and the expense thereof shall be apportioned between it and the said other two companies, the apportionment to be determined by the use thereof which they shall respectively make as evidenced by the wheelage; payment of the sum required to be made monthly to the Des Moines & St. Louis Railway Company, within 10 days after rendition of an account stated.

"Seventh. The control of said property by the Des Moines & St. Louis Railway Company shall not extend to a determination of the character and extent of improvements to be now or hereafter put upon the same, but differences between the parties under this head shall be settled by arbitration.

"Eighth. It is understood and agreed that spur tracks shall be built connecting the said terminal grounds with such manufactories and other sources of trade in and about the city of Des Moines as afford sufficient opportunity for profit by so doing, and that all of said tracks shall be adapted for use for both broad and narrow gauge trucks: Provided that in case either of said companies shall deem the construction of any of said tracks as not advantageous to its business, the question of constructing said track, and which of the parties hereto shall pay therefor, shall be determined by arbitration.

"Ninth. Taxes and assessments levied upon said property shall be charged to maintenance account.

"Tenth. In the event that any company, whose railroad does not extend to Des Moines, shall effect an arrangement for running its trains into Des Moines over the railroad of either of the parties hereto, such company shall be entitled to the use of all of said terminal facilities upon the payment of a fair sum for rental and its proportion of the maintenance account, the rental

to inure to the companies hereto in the same proportion as the original outlay, and the sum due from such company for maintenance account to be determined in the same manner as the sums due from the other companies, parties hereto. Railroad companies, whose roads extend to Des Moines, may be admitted to the use of said facilities by agreement of all the companies parties hereto.

"Eleventh. All differences arising under this agreement shall be referred to arbitration; one of said arbitrators shall be chosen by the Des Moines & St. Louis Railway Company, another by the St. Louis, Des Moines & Northern Railway Company, and the third by the two thus selected. The judgment of any two of the said arbitrators shall be final. If the matters of difference shall be between the Des Moines & St. Louis and the Des Moines Northwestern, then the second arbitrator shall be chosen by the Des Moines Northwestern, and not by the St. Louis, Des Moines & Northern.

"Twelfth. It is mutually understood that the grounds so to be held in common by the companies, parties hereto, are all east of Farnham street in the city of Des Moines, and that no grounds west of Farnham street have been acquired under this agreement."

An analysis of this contract shows a statement of the occasion and object of the contract; provisions for the title, the use and occupation, the maintenance, and the improvement of the property; and for arbitration.

The occasion and object of the contract is stated to be to provide for the common holding and use by the three companies of the property and improvements then or thereafter acquired or constructed for terminal facilities.

As to title, the property was "to be held in common" (paragraph twelfth) through the medium of a trustee to be selected by the companies, in whom the title should "be and remain * * * subject to the joint use and occupation of all of said railway companies upon the terms herein described" (paragraph fourth). If outside railways effected arrangements to enter Des Moines over any of the three lines, they should, beside a portion of the maintenance cost, pay a fair rental "to inure to the companies hereto in the same proportion as the original outlay" (paragraph tenth). The individual "signers hereto" declared the property acquired in their names to have been "upon the trusts above referred to," and agreed "to quitclaim and convey the same to said trustee upon demand and reimbursement" (paragraph fifth). Payment for the property was to be borne by the three companies, in proportions of one-half by the Des Moines & St. Louis and one-fourth by each of the other companies, with a provision that, if a depot company should be organized and should take permanent charge of the property, "said company may issue and deliver to the companies, parties hereto, its mortgage bonds to the amount of their respective portions" of expenditures for the property (paragraph third).

The use and occupation of the property was to be "joint" (paragraph fourth), under the "police control" and "supervision" of Des Moines & St. Louis (paragraph sixth). Industrial spur tracks, which might be built, should be adapted to both standard and narrow gauge (paragraph eighth). There was provision for the use of these terminal facilities by outside companies. If such company did not extend to Des Moines, but should effect an entrance by a running arrangement over any of these three lines, such company should be en-

titled to the use of all the terminal facilities upon payment of a fair rental and its proportion of the maintenance account. Other railways might "be admitted to the use of said facilities by agreement of all the parties hereto" (paragraph tenth).

The maintenance of the property, including taxes and assessments (paragraph ninth), was to be in charge of the Des Moines & St. Louis, the expense to be divided on a wheelage basis and paid monthly to said company on rendition of accounts therefor (paragraph sixth). Any other company entitled to use the terminals under paragraph tenth to bear its wheelage proportion (paragraph tenth).

Regarding future improvements, the contract provided they must, in character and extent, be such as agreed upon by the three companies, or, if a disagreement, such as determined by arbitration (paragraph seventh and eighth); the cost of such to be paid, one-half by the Des Moines & St. Louis, and one-fourth by each of the other companies (paragraph third), except that arbitration might settle which of the companies should pay for industrial spur tracks, the construction of which had been opposed by one of the companies as not advantageous to its business (paragraph eighth).

Obviously, the only purpose of including the individuals, Dodge and How, in the contract, was to control the title taken in their names. They figure in the future of the plan, as outlined by the contract, only for the purpose of conveying their title "to said trustee upon demand."

Also, there is mention of a "depot company." Under the influence of a knowledge of what was afterwards done, there is danger of exaggerating this reference. Clearly it was rather incidental. Its physical location in the contract is significant of the place it occupied in the minds of the parties at the time in connection with the contract. The contract is carefully drawn by skilled draftsmen, who set off in brief, clean-cut, numbered paragraphs the different subjects of the contract. If the "depot company" had bulked large in their contemplation at that time, or if it was to form any essential part of their then plan, it is strange it did not receive some separate and distinct consideration. In fact, it occurs in the paragraph which sets forth the proportions in which the companies are to bear the expense of acquiring and improving the terminal property. Its obvious connection with that idea is that it contains the only suggestion of any method of reimbursement for such outlay. In our judgment, that was the only reason for mentioning, in the contract, the matter of such a company. Even as expressed, while it shows that the subject of such a company had been considered, it also reveals that either the project had not reached the stage of completion and concurrence, or that everything regarding it was purposely left in complete abeyance, in so far as this contract is concerned. The expression is that such a company "*may* be organized, * * * *may* take permanent charge of the property, * * * *may* issue and deliver to the companies * * * its mortgage bonds. * * * "

As to the companies, the contract not only declared some existing property rights, but attempted to define for the future the rights of title and usage of the terminal property. The title contemplated was

a trust. The legal title to be "in a trustee to be named by agreement of said companies." The beneficial estate to be in the three companies in proportion to the parts each contributed to the payment therefor. While this proportional interest is not set forth in so many words, it is necessarily inferred from the combined circumstances that the companies were to pay therefor and for improvements thereto in proportions of one-half, one-fourth, and one-fourth (paragraph third), and that the only possible source of profit then contemplated or provided for (rental from any tenant companies) was to inure to the three companies in the same proportion (paragraph tenth). But there was to be no proportional limitation of usage. There was to be a "joint use and occupation of all of said railway companies" (paragraph fourth). Nothing in the entire contract hampers the complete independent individual occupation and use of all the terminal facilities at all times by each of the companies except the two provisions that the occupation and use shall be "joint" (paragraph fourth), and that the Des Moines & St. Louis shall be charged with the "police control and supervision" thereof (paragraph sixth). It was apparently intended that each company should do its own terminal work with its own men and equipment. The only other precedence given either of the companies was the necessary one of "maintenance," with which the Des Moines & St. Louis was also charged (paragraph fourth). In short, the three companies gave up independence of title and of action in the occupation and use of the property only in so far as was absolutely necessary to what they then considered a safe joint occupation and use.

But whatever may have been the importance of a depot company in the minds of the contracting companies at the time the contract was executed, such (defendant herein) was incorporated under the Iowa statutes on December 10, 1884. However, conveyances to this new company, and acceptance by it, affecting the existing terminal property, although first authorized by resolutions of the four companies January 1, 1885, did not begin until November 7, 1887, nor end until April 28, 1888. The actual management of the property by the terminal company did not commence until May 1, 1888, up to which time the companies occupied and used it in common under the 1882 contract.

What effect upon the title, control, use, and occupation of this terminal property had the formation of this terminal company and these conveyances of the property formerly owned, occupied and used by the railway companies under the 1882 contract? This involves consideration (in the light of attendant acts and circumstances) of the articles of incorporation of the terminal company, the resolutions of the four companies in reference to the conveyances, the conveyances themselves, and an attempted amendment of the articles of incorporation.

The only official action taken by any of the railway companies concerning and prior to the incorporation of the terminal company was a resolution of the board of directors of the Des Moines Northwestern Railway Company on December 9, 1884 (the day preceding the incorporation). This resolution declared "it is desirable that a corporation be

organized for the purpose of taking and holding" the property covered by the 1882 contract. It then chose its representatives "to act for this company in the organization of such corporation, and they are selected to act as two of the directors of said proposed corporation so to be organized for the purpose of carrying out the objects of said contract of January 2, 1882." December 10, 1884, all of the parties to the 1882 contract met for the purpose of incorporating the defendant company, Gen. G. M. Dodge appearing both for himself and for the St. Louis, Des Moines & Northern, two individuals representing the Northwestern, and two the Des Moines & St. Louis. The sole business of the meeting was the passage of resolutions referring to the articles of incorporation. The resolution of adoption declared "that for the purpose of carrying out the objects and purposes of the agreement heretofore, to wit, on the 2d day of January, 1882, made and entered into by and between the Des Moines & St. Louis Railroad Company and others (which is set out in full in the following articles of incorporation)," the articles be adopted as follows:

"Articles of Incorporation of the Des Moines Union Railway Company.

"Whereas, the Des Moines & St. Louis, the Des Moines Northwestern, and the St. Louis, Des Moines & Northern Railway Companies have been engaged in the construction of railways converging at Des Moines, Iowa, and have secured certain franchises, purchased certain realty and made certain improvements thereon—which they have heretofore agreed should be secured, purchased, made and maintained upon certain agreed conditions; at their joint expense—in accordance with a contract made and entered into by and between said companies and Grenville M. Dodge and James F. How, trustee, bearing date January 2, A. D. 1882, and which contract is in words and figures as follows, to wit: [Here the contract was set forth.]

"Whereas, each of said railway companies and said parties has expended large sums of money in purchasing and improving the property aforesaid, and in the construction of suitable buildings for the use of said companies; and

"Whereas, it was provided in the contract aforesaid that a depot company might be organized to take permanent charge of the property, and it was the understanding of the parties that such company might acquire, operate and maintain said property in such manner as best to serve the interest of the parties hereto:

"Now, therefore, for the purposes aforesaid, as well as for those hereinafter expressed, the undersigned hereby associate themselves in a body corporate, and adopt the following:

## "Articles of Incorporation.

### "Article 1.

"The name of the corporation shall be the Des Moines Union Railway Company, and its principal place of transacting business shall be Des Moines, Iowa.

### "Article 2.

"The general nature of the business to be transacted shall be the construction, ownership, and operation of a railway in, around, and about the city of Des Moines, Iowa, including the construction, ownership, and use of depots, freight houses, railway shops, repair shops, stockyards and whatever else may be useful and convenient for the operation of railways at the terminal point of Des Moines, Iowa, as well as the transfer of cars from the line or depot of one railway to another, or from the various manufactories, warehouses, storehouses, or elevators to each other or to any of the railways or depots there-

of, now constructed or to be hereafter constructed, in or around said city of Des Moines, and such corporation shall possess all the powers conferred upon corporations for pecuniary profit by chapter 1 of title 9 of the Code, and the amendments thereto. All the powers exercised by this company shall be in accordance with the terms and spirit of the aforesaid contract entered into on the 2d day of January, A. D. 1882, by and between the Des Moines & St. Louis Railroad Company, the Des Moines Northwestern Railway Company, the St. Louis, Des Moines & Northern Railway Company, Jas. F. How, Jas. F. How, trustee, and Grenville M. Dodge. The said company shall have the right to lease or otherwise dispose of the use of any part of its franchises to any other railway company—provided that the assent in writing of the Des Moines & St. Louis Railroad Company, the Des Moines Northwestern Railway Company and the St. Louis, Des Moines & Northern Railway Company shall be necessary before any such lease or disposition can be made to any other than the parties above named.

### "Article 3.

"The capital stock of this corporation shall be one million ($1,000,000.00) dollars, which shall be divided into shares of one hundred ($100.00) dollars each, and shall be paid in at such times and in such manner as the board of directors may determine, and the board are authorized to receive in payment therefor the property and franchises in the city of Des Moines, now held by the Des Moines & St. Louis Railroad Company, the Des Moines Northwestern Railway Company, the St. Louis, Des Moines & Northern Railway Company, Jas. F. How, trustee, Jas. F. How, and Grenville M. Dodge.

### "Article 4.

"The affairs of the company shall be managed by a board of eight directors, who shall be elected annually, by the stockholders, on the first Thursday of January of each year. The provisional board of directors, who shall hold office until the first Thursday in January, A. D. 1886, shall consist of Jas. F. How. A. L. Hopkins, A. A. Talmage, J. S. Runnells, J. S. Polk, F. M. Hubbell, G. M. Dodge, C. F. Meek.

"Four members of the board shall be nominated by the Wabash. St. Louis & Pacific Railway Company, two members by the Des Moines Northwestern Railway Company and two members by the St. Louis, Des Moines & Northern Railway Company, and no stockholders shall be eligible for membership of the board unless so nominated.

"The fact that a candidate has been duly nominated shall be certified to the stockholders' meeting of this company by the secretary of one of the respective companies aforesaid and such certification shall be conclusive.

"The provisions herein with respect to nomination for the board of directors shall apply to and be enjoyed by any grantee or assignee of either of the railway companies aforesaid. No contract, lease, or other agreement, amounting to a permanent charge upon the property of the corporation, shall be entered into by the board unless the same shall have been first approved by the Des Moines & St. Louis Railroad Company, the Des Moines Northwestern Railway Company and the St. Louis, Des Moines & Northern Railway Company, or their assigns, and shall have been submitted to a meeting of the stockholders, duly called, and shall have been approved by more than three-fourths of all the stockholders; and it shall not be within the power of the board of directors to create any limitation whatsoever upon any of the franchises of the corporation, except the same shall have been submitted to and approved by the stockholders as hereinbefore provided.

"The directors shall elect, from their number, a president, vice president, secretary and treasurer. All vacancies arising from the death or resignation of a member of the board shall be filled by the board.

### "Article 5.

"The president, vice president, secretary and treasurer shall possess the powers and discharge the duties of like officers of similar corporations, subject to the limitations imposed by these articles. The officers, hereby con-

stituted, who shall hold their places until the first Thursday in January, 1886, or until their successors are duly chosen, shall be as follows: President, G. M. Dodge. Vice president, Jas. F. How. Secretary and treasurer, F. M. Hubbell.

### "Article 6.

"The private property of stockholders shall be exempt from liability for corporate debts and undertakings.

### "Article 7.

"The highest amount of indebtedness to which the corporation may at any time subject itself shall be the amount authorized by law.

### "Article 8.

"Meetings of the board of directors may be called by the president, or, in case of his absence or disability, by the vice president, and shall be called upon request preferred in writing by two members of the board.

### "Article 9.

"These articles may be amended by a vote of more than three-fourths of all the stock in favor thereof, at a meeting of the stockholders thereof, of. which a notice containing the proposed amendments shall be mailed to each stockholder at his address, as disclosed by the transfer books of the company. Notice of such proposed meeting shall also be given by publication for three successive weeks in some newspaper of general circulation—published in the city of Des Moines, Iowa.

### "Article 10.

"This corporation shall commence on the 5th day of December, A. D. 1884, and continue 50 years, with the right of renewal."

That the creation and entrance of the terminal company into the arrangements of the parties had a marked influence is certain. Here was a creature of the companies, brought into being for the cardinal purpose of taking, by some sort of title, this terminal property, improving, maintaining, and operating it. No title was conveyed in the articles of incorporation. Had nothing further been done the title, control, and operation of the terminal property would have been unaffected. But these articles are valuable as throwing light upon the intention of the parties as to the place that company was to have in their terminal plans. These articles contain provisions in addition to such as would have been necessary in the mere creation of a terminal company—to such as would have been employed by outsiders, whose only purpose was to engage in a terminal business. It is in these exceptional provisions that the particular intention of these parties is to be found. The articles include what may be called a "preamble," which, after reciting the occasion of the 1882 contract, the contract in extenso, and the expenditure of money in pursuance thereof, makes its sole reference to the terminal company as follows:

"Whereas, it was provided in the contract aforesaid that a depot company might be organized to take permanent charge of the property, and it was the understanding of the parties that such company might acquire, operate and maintain said property in such manner as best to serve the interest of the parties hereto"

—declares that "for the purposes aforesaid, as well as for those hereinafter expressed, they associate themselves in a body corporate, and

adopt the following articles of incorporation." The clear statement in this preamble reference is that the parties intend the terminal company "to take permanent charge of the property" and "to acquire, operate, and maintain said property" in such manner as best to serve their interests.

In what we may call the articles proper we find certain provisions which reveal the intention of the railway companies, not only to keep the stock ownership (seemingly contemplated in the authority given the board of directors "to receive in payment therefor the property and franchises in Des Moines, now held" by the railways and individuals, parties to the 1882 contract), but to exercise a control over the property and over the actions of the terminal company beyond such as would spring from stock ownership alone. Our immediate inquiry has no concern with the legality of these exceptional limitations, if attacked in a proper way, but, taking them as they are, what light do they throw upon the intention of the parties?

Such control may be roughly classified into three kinds: (a) The requirement that the board of directors should be nominated by the three companies, treating the Wabash as identical in interest with the Des Moines & St. Louis (A–4); (b) requirements relating to the disposition of the use of any part of its franchises to any other railway company (A–2), to the creation of any limitation upon such franchises (A–4), and to the creation of any permanent charge upon the property (A–4); and (c) a broad requirement that all of the powers of the corporation shall be exercised "in accordance with the terms and spirit" of the 1882 contract (A–2).

The first of these three classes (a) shows the method of controlling the board of directors. Aside from any previous contract, the railways might want a provision perpetuating in them the choice of directors, and the only connection in thought with the 1882 contract suggested by this requirement is in the circumstance that each railway company was to choose directors in proportion to their interest in the property under that contract. If the selection of directors were to depend entirely upon the vote of the stock, there was no assurance that two of the railways might not combine their votes and exclude the third from any voice in the active management. Therefore they sought to assure, not only complete control of the board, but the same representation upon the board as each of them was to have in the property under the existing contract; the idea also doubtless being in their minds that the stock which paid for that property would be similarly divided.

The second requirement (b) shows the method intended to preserve the control of the railway companies over the property and franchises acquired by the terminal company. Without the previous approval of the three railway companies, no disposition of the use of any part of its franchises could be made to any other railway company, nor could any permanent charge be placed upon its property.

Passing from these specific provisions, looking toward the control by the railway companies of the management, franchises and property of the terminal company, we approach the general requirement

(c) that "all the powers" of the terminal company shall be exercised "in accordance with the terms and spirit" of the 1882 contract. What does this mean? Evidently a limitation upon the exercise of the corporate powers. Subject to the limitations above discussed, those powers were such as ordinarily belonged to a corporation organized under the Iowa Code for pecuniary profit to construct, own, and operate a terminal railway, with all of its attendant depots, warehouses, shops, etc. What, then, were the further limitations carried by this reference? How was the free exercise of these powers of the terminal company in constructing, owning, and operating a terminal to be limited by the terms or spirit of the contract? The terms and intent of the contract as to *construction* were that there should be only such improvements and extensions as were agreed upon by all the three railways, or settled by arbitration, and to be paid for (except as to certain industrial spurs) by the three on the basis of their contemplated interests in the property of one-half, one-quarter, and one-quarter. The contract terms and intent as to *ownership* were a trust. The contract terms and intent as to *operation* were that each company should do its own terminal work under the police control and supervision of the Des Moines & St. Louis. Under the contract the cost of *maintenance* (including taxes and assessments) was on a wheelage basis. Under the contract *the use of the facilities by other roads* was to require agreement of all three roads, except that any other road entering Des Moines over the tracks of any of the three railways might use them on payment of rental to the roads and a wheelage part of the maintenance.

It is clear that all of these terms and intentions neither were intended to nor could survive the introduction of the terminal company. It is also clear that some of them were to remain active. It is impossible from the two instruments alone (contract of 1882 and articles of incorporation), read in the light of their history, to draw a line in this particular which is at all points clear and definite. Some things, however, seem distinct. Touching *operation*, it is conceded by all parties to this suit that the plan of the contract that each of the railways should do its own terminal work over tracks in joint use was dangerous and unworkable. Doubtless this was one of the main underlying necessities for a terminal company, which could, with its own engines and men, do all of this terminal work. Each of the companies was to have terminal facilities, but in a different method from that covered by the contract. The idea of a joint usage, in the sense of a right in each of the three railways to make an individual usage of the same property during the same period, had been found unsatisfactory and abandoned for the better plan. The contract plan of operation was to be replaced in its entirety.

As to *ownership*: No title or interest in the property owned or held by all or any of the parties to the contract passed or was affected by the articles of incorporation. It is quite clear, however, in the articles, that the parties intended in the future to turn over that property to the terminal company. What was to be the character of the title or interest they intended to convey? There is no dispute

in this case that as much as the bare legal title was to go. Was the full beneficial interest also to pass? When the parties made the 1882 contract, which provided for a trust, they also revealed therein that a terminal company had been under discussion. In an almost incidental way that matter was mentioned in connection with payment for the property covered by the contract. This mention was that such a company "may issue and deliver to the companies parties hereto its mortgage bonds, to the amount of their respective portions of the costs of said purchases and improvements." Why issue and deliver the bonds, unless they carried value? Why issue and deliver them, except for some value in return? In short, the idea in the contract was compensation or reimbursement. The compensation or reimbursement was to be for money paid out for the legal title and the beneficial interest in the property. The only thing which the parties then had in view to give value to a mortgage and its bonds was this same property. Clearly the parties had considered before and at the time of the contract that the plan first to be tried might give way to that of a terminal company, and that such company might acquire the entire title to the property. Coming to the articles, we find no change in this conception. The preamble recited that—

"It was the understanding of the parties that such company might acquire, operate, and maintain said property in such manner as best to serve the interest of the parties hereto."

Nothing is said regarding the use of mortgage bonds, but article 3, dealing with capital stock, authorized the directorate of the new company "to receive in payment therefor the property and franchises in the city of Des Moines now held by" the parties to the contract. What other than the beneficial interest in this property could have constituted in any real sense "payment" for the stock? Article 4 required the consent of all three companies before any "permanent charge" could be placed by the terminal company upon the property. Thus the plan, so far as revealed by the articles, seemed to remain as suggested in the contract, with the additional idea of a payment in stock; in short, the complete title to go to the company, with the terms of payment not definitely settled, but suggestions of the value in bonds up to the outlay (in the contract) and of the capital stock of the company (in the articles).

As to maintenance: There is but one direct statement, and that is the one from the preamble quoted above. As to where the funds are to be secured therefor, there is no suggestion, unless we can infer that the plan of the contract is to prevail, or that indebtedness may be incurred therefor.

As to the use by other railways: There is the provision that the company shall have no right, without the prior written consent of the three railways, "to lease or otherwise dispose of the use of any part of its franchises to any other railway company."

Summarizing, the intention of the parties, as revealed by the articles of incorporation, shows a development of the terminal plan, changing, but not entirely abandoning, that of the 1882 contract. The continuing influence of that contract is evident, though the limits of that

influence are not in all respects clearly defined. As to operation, it is evident that the general agency thereof was to be entirely different from that contemplated by the contract, but there is lack of certainty as to the influence of the contract over the action of this new agency. As to title the intention is clear. As to improvement and maintenance there is indistinctness.

The conduct and acts of the parties during the next few following years gradually clarified, crystallized, and consummated the entire plan. The intention that the entire title to the property should pass to the terminal company had been suggested in the 1882 contract and adhered to in the articles of incorporation of that company. It was to be further emphasized in resolutions of the four companies relating to the transfers of the title. It was to be consummated in those conveyances. The plan as to improvements, maintenance, and operation of the property in the hands of the terminal company, which had been so dimly outlined in the charter requirement that the powers of the terminal company should be exercised "in accordance with the terms and spirit" of the contract, obviously needed further and clearer definition. The 1882 contract was most general in its provisions, and it applied to a situation in which a terminal company had no place. No one could determine what the "terms and spirit" of the 1882 contract meant as applied to the management of the terminal company. Very soon after the terminal company took control of the property, the parties dispelled this uncertainty by a supplemental contract, explaining clearly what they meant in that regard by the "terms and spirit" of the 1882 contract. This was the contract of May 10, 1889, related back to the date the terminal company took control (May 1, 1888), and covering a term of 30 years. It completed in a workable manner the terminal plan. While all-important in the other branch of this case, this last contract is no more than a side light upon the main controversy, which pivots upon the character of title in the property conveyed to the terminal company.

The first step toward a transfer of title was the action by stockholders' meetings of the four companies, all held January 1, 1885. At these meetings the railway companies (each reciting that the terminal company had been "organized as contemplated and provided in the aforesaid contract, to acquire, hold, use, and enjoy the real estate, property rights, and franchises in the city of Des Moines * * * of the aforesaid railway company and signatories of said contract acquired and held thereunder, and to carry out the purposes of the said contract") ratified and accepted the articles; undertook "to discharge all the obligations imposed upon it by said contract in order to make effective the purposes of" the terminal company; and authorized its proper officers—

"upon the issuance to it of the share of the bonds and stock of said Des Moines Union Railway Company, to which it may be entitled under said contract to convey, assign, and transfer to said company all its right, title, and interest of whatever name and character, in and to the real estate, franchises, choses in action, and rights in possession or contingent to all the property in the city of Des Moines east of Farnham street in said city now held, enjoyed, or claimed by either or all of the signatories of said contract

of January 2, 1882, or any agent or trustee thereof, purchased, acquired, or held in pursuance of said contract."

Upon the same day the terminal company, at the first meeting of its board of directors, appointed a committee—

"to confer with the several parties to said contract and agree with them severally upon the terms and price at which they will respectively assign, transfer, and convey said railroad property and franchises to this company, and procure from them, and each of them, such conveyance and transfers as may be necessary to fully invest this company with the title, control, and management of said properties as provided for in said contract of January 2, 1882."

It also directed the issue of not to exceed all of its fully paid capital stock and not to exceed 500 bonds, of $1,000 each, secured by mortgage on "all of said property so to be conveyed to this company or thereafter to be acquired." This stock and these bonds were "to enable this company to pay for the property and to maintain, operate, and improve the same, and purchase other property necessary to carry out its objects, and remove any and all liens or incumbrances thereon, and pay off all just claims against the same." With the provision that, when the above committee "shall have agreed with the said several parties to said contract as to the amount of bonds and stocks of this company necessary to be delivered to them, and each of them, in payment for said railroad property and franchises," and shall have delivered the same "on receipt of the conveyances and assignments of said property so to be made to this company," the remainder of the bonds and stock shall be issued from time to time as needed only for the above purposes. Deeds in compliance with these resolutions were not made until beginning with November 7, 1887, and ending April 28, 1888. Nor did the terminal company take possession and operate that property until May 1, 1888, after the last of these deeds, although two of the three railway companies had at these same January 1, 1885, meetings, voted to at once "transfer the management and operation of its property in Des Moines" to the terminal company, expressly leaving the settlement as contemplated by the other resolution to be arranged later, and although the terminal company at its meeting that day assumed to take immediate charge. It is not shown in the record why there was this delay in executing the deeds, although counsel suggest it lay in the confusion attending the passage through financial difficulties of the Wabash & Pacific, the largest single force in the terminal arrangement.

November 1, 1887, the terminal company, at a stockholders' meeting called "for the purpose of considering the question of amending the articles of incorporation of this company, and issuing bonds of the company for the purpose of raising money to purchase, construct, and improve its railway and property," increased its capital stock to $2,000,000 (without changing the authorization to receive therefor the properties in payment), and authorized the issue of not over $800,000 bonds, "secured by mortgage or deed of trust on the property of this company, and the same or the proceeds thereof to be used in purchasing and paying for its property and improving the same, and build-

ing its railways, depots, roundhouses, and shops, and making other improvements."

Within a week later the directorates of the four companies passed practically identical resolutions in reference to the transfer of the property taken in the names of Dodge and of How. The substance of these resolutions was a request to How and to Dodge "to transfer to" the terminal company the property so held upon receipt of stipulations to deliver to each of them as soon as practicable "first mortgage bonds of that company to the amount of the money advanced for the payment of said property and improvements with interest on same and taxes paid thereon" and the capital stock of the company; the stock to go one-fourth to Dodge and three-fourths to How, the latter to transfer the stock and bonds coming to him to the purchasing committee of the Wabash "in lieu for the money advanced by said company to make the purchase of above property and improvements, and the payment of taxes for this company."

In addition the Des Moines & St. Louis authorized its officers to execute a deed to the terminal company, "conveying to it all its real estate, rights of way, franchise, roadbed, and other property of said company lying and being in the city of Des Moines, east of Farnham street," no matter how acquired; this being done "for the purpose of carrying out the contract of date January 2, 1882."

On the same day, upon receipt of formal notices of the above resolutions passed by the railway companies, the terminal company, at a directors' meeting, accepted the above action of the railway companies, authorized the delivery of the stock and bond warrants, the execution of the mortgage, and issue of bonds.

All of the above resolutions were passed at stock or directorate meetings of the companies. The entire membership of the terminal company was selected by the railway companies and undoubtedly simply registered their will. The resolutions emphasize and confirm the statements made above as to the intention of the railways (revealed in the contract and the articles) that the *entire* title should pass to the terminal company and be paid for by stock and bonds of that company.

In pursuance of the resolutions, How and Dodge delivered deeds. There were three from How, covering different pieces of property. The first two were identical in form. Omitting legal description of the property they were as follows:

"James F. How, Trustee, to Des Moines Union Railway Company.

"Deed.

"Whereas, the property herein described was from time to time purchased with the moneys and funds of the Wabash, St. Louis & Pacific Railway Company, a corporation; and whereas, for its convenience the legal title to said property was conveyed to me in trust; and whereas, said property was acquired and held for the purpose and upon the terms set forth in a certain contract made and entered into on or about the 2d day of January, 1882, between the Des Moines & St. Louis Railway Company, the Des Moines Northwestern Railway Company, and the St. Louis, Des Moines & Northern Railway Company, G. M. Dodge, James F. How, and James F. How, trustee, and which contract was consented to by said Wabash, St. Louis & Pacific Railway Company; and whereas, I have heretofore, at the request of said Wa-

bash, St. Louis & Pacific Railway Company, stated and declared in writing that I held the legal title to the real estate hereinafter described in trust for said Des Moines & St. Louis Railway Company and said Des Moines Northwestern Railway Company; and whereas, the board of directors of said Des Moines & St. Louis Railway Company and the board of directors of said Des Moines Northwestern Railway Company did, on or about the 8th day of November, 1887, pass certain resolutions containing among other things the following, to wit:

"'Whereas, James F. How has, prior to 1881 and since then, purchased certain property and made expenditures on same as trustee for this company, the money expended for said property being furnished by the Wabash, St. Louis & Pacific Railway Company; and whereas, under an agreement with this company and the Wabash, St. Louis & Pacific Railway Company and others, it was intended that said property standing in the name of James F. How, trustee, should be transferred to the Des Moines Union Railway Company under certain conditions: It is hereby resolved that James F. How is requested by this company to transfer to the Des Moines Union Railway Company the property above referred to' :

"Now, therefore, know all men by these presents: That I, James F. How, trustee, as aforesaid, of the city of St. Louis, state of Missouri, in consideration of the premises, and of the sum of one dollar to me in hand paid by the Des Moines Union Railway Company, the receipt whereof is hereby acknowledged, have granted, bargained, sold, and conveyed, and by these presents I do hereby grant, bargain, sell, and convey, unto the said Des Moines Union Railway Company the several lots or pieces and parcels of ground situated, lying, and being in the city of Des Moines, county of Polk, state of Iowa, particularly described as follows: * * *

"To have and to hold all and singular the several pieces and parcels of real estate aforesaid, with all the appurtenances thereunto belonging, unto the said Des Moines Union Railway Company, a corporation, and its assigns forever. It is expressly understood, however, that I only undertake to convey such title as I may have in said premises, and that I only undertake to warrant and defend against those claiming through and under me."

The third deed substantially differed only in that the conveyance recited it to be by How "as trustee aforesaid." The deed from Dodge was an ordinary quitclaim. A few lots which had been taken in the name of the Northern were quitclaimed by a deed which conveyed the described lots—

"together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and also all the estate, right, title, interest in the above-described property, possession, claim, and demand whatsoever, as well in law as in equity, of the said parties of the first part, of, in, or to the above-described premises, and every part and parcel thereof, with the appurtenances, to have and to hold all and singular the above mentioned and described premises, together with the appurtenances, unto the said parties of the second part and assigns forever."

Other property which stood in the name of the Des Moines & St. Louis was conveyed by general warranty deed. All of these deeds were recorded, so far as this record shows, on April 26, April 27, or May 1, 1888. The mortgage authorized was dated November 1, 1887, acknowledged February 13 and 28, 1888, and recorded May 21, 1888 (three weeks after record of the last of the above deeds on May 1). There was never any deed from the Northwestern, which had no property standing in its name.

It is unprofitable to trace the different later steps connected with and leading up finally to the payment for the property by bonds covering the actual expenditures and stock totaling 4,000 shares ($400,000). With the passage of these deeds and consideration ends the history of the title. All of these transactions result as follows: An intention on the part of all parties that the entire title shall go to the terminal company; payment by that company of the full consideration therefor ultimately agreed upon; deeds designed to convey that full title.

[2] But it is said that, if the railways did so convey all interest in these necessary parts of their roads, such action would be void. The rule invoked is that public carriers will not be permitted to contract away their public usefulness by vitally maiming their lines. Rules of law extend no further than the basic reasons upon which they rest. The usefulness, if not the necessity, of terminal companies is established. That they must, as a general proposition, own their properties in order to raise funds to improve, maintain, and operate them efficiently, is certain. The more efficiently and economically a railway can procure terminal facilities, the better and cheaper its services to the public should be. The conditions and compensation for use of such terminals by the railways are subject to public control, so that the railways cannot be denied or unreasonably restricted in such usage. The public service is protected. It should be bettered by such a terminal arrangement. Therefore the rule invoked by plaintiffs has no application to disposition of terminal portions of a railway to a terminal company.

It is urged that the terminal company has, by its own statements, declared that it had no beneficial interest in the property. The statements intended are contained in reports made by that company to the Executive Council of Iowa for the years 1888, 1889, 1890, 1892, and 1893. In these reports the company stated that it was "simply a representative company, acting as an agency" for the railway companies, "performing all necessary work for them, and charging each at actual cost, its due proportion thereof incurred." These reports were made for purposes of taxation. During all of these years, except 1892 and 1893, the entire income was applied in reduction of the bills of the railway companies, and for those 2 years it should have been so applied under the terms of the 30-year contract, dated May 10, 1889; so that, in fact, it had no income which properly remained as its own. Again, if the use of the term "representative" is to be emphasized, it would be met by the terms "tenant" and "lessee," applied to the railway companies, in a contract dated July 31, 1897. This latter contract was between the terminal company and the complainants, or their predecessors. It applied to and affected the contract of 1889, under which the companies are and have been operating since very shortly after the terminal company began to control the property.

It is contended that complainants retained through the articles of the terminal company an interest in and control over the property. As we have endeavored to show above, no interest was retained in the property through these articles of incorporation. The title was un-

disturbed and unaffected until the deeds transferred it. However vocal the articles of incorporation and the resolutions of the different companies may have been of the intention of the parties, these expressions passed into effective action only in the deeds. But the articles did provide for a direct control over the property by the railway companies. This was through the requirement that the prior consent of the railways was necessary before leasing or disposing of the use of any part of its franchises, or before placing any permanent charge upon the property, and the requirement that the railways, not the stock, should name the entire directorate. This control was purely contractual in its nature, and neither sprang from nor gave rise to any legal estate or interest in the property itself, affecting the full and complete title of the terminal company. When the deeds passed, the terminal company held the complete legal and equitable title to the property, though it had by contract restricted its freedom to lease, dispose of, or incumber it.

[3] The above control was later relinquished. April 8, 1890, there was an attempt to amend the articles. The result of the proposed amendments would have been to take from the railways, as such, all of the control given by the original articles, to substitute therefor a character of veto control by one-eighth of the stock, and to provide that, not all, as formerly, but 4,000 shares, of the capital stock should be paid the railway companies, in addition to the bonds then already issued, as the full purchase price of the property deeded by the railways. The railways contend that they were invalid, because not properly adopted, and that, even if valid, they could not alter the relations between the railways and the terminal company, because such were based upon contractual rights which had become vested, and which the railways had not by formal corporate action consented to be altered.

The claim that the amendments were never properly adopted is well taken, but not open to complainants. The exact rights of any one to any of the capital stock were not determined definitely until the contract of May 10, 1889, and no stock had been issued at all up to the date of the attempted amendments. However, the company had maintained an organization from its incorporation, December 10, 1884. This was not difficult, as the articles themselves provided for the nomination of the entire board by the railway companies, no other party had any interest in this terminal company or property, and it was not active in the control and operation of the property until May 1, 1888. But when the corporation undertook to amend its fundamental law, that could be legally done only by the stockholders. There was no stock issued; there was only a right to stock through the contract of 1889. This contract provided (section 26) for the issuance of the entire authorized capital of $2,000,000 (20,000 shares), 10,000 shares to the St. Louis Company and 5,000 shares to each of the other two companies. It appears from the same section of the contract that each company was to stock-qualify its own terminal company directors. With the three companies entitled to all the stock, and with none of it issued, the eight men (in person or by proxy), who had been selected by these companies as their choice for directors, met in a stockholders'

meeting, claiming to represent one share of stock each. There is a statement in the minutes of that meeting that the railway companies "were also present" in the person of three of these men, who were respectively president or vice president of each of the railways. It is not stated or claimed that such alleged representatives were there holding the proxies of the stock to which their respective companies were entitled, or that as such representatives they participated in any way in the meeting. Nor is it claimed that any of them had any authorization from his company (unless such adhered to his official position) to so be present or to represent it. At such a meeting the amendments were duly passed. Formal requisites of the Iowa law as to publication, etc., of corporate amendments were met.

Articles of incorporation have a dual character; they are at once a grant of authority and a contract. The matter of authority is between the state and the incorporators alone. The matter of contract, while always and primarily between the state and the incorporators, may include third parties, either actual or in prospect. Hawthorne v. Calef, 2 Wall. 10, 17 L. Ed. 776; Curran v. Arkansas, 15 How. 304, 14 L. Ed. 705; Woodruff v. Trapnall, 10 How. 190, 13 L. Ed. 383. The relation between such third parties and the incorporators, or their combined entity, the corporation, is purely contractual. It possesses no different or higher attributes because its terms find expression in an instrument to which the state is also a party. Such contracts are subject to the ordinary rules of law governing contracts. It is, of course, evident that such third parties and the corporation could not alter such contract in any manner that would affect the rights of the other party, the state. Although there are additional reasons why this should be so where the state is a party to this character of contract, yet neither can two of three parties to any contract so alter their contractual relations as to affect the third without its consent. No reason appears why in this, as any kind of tri-party contract, two of the parties may not at will alter or annul any of such contract rights, if such action affects them alone.

With such power to change their rights, the question becomes whether or not the terminal and railway companies have altered or annulled the rights arising from the contract contained in the articles of incorporation. They took no formal corporate action accepting or ratifying these attempted changes in their contractual relations with the terminal company. But all of the individuals who acted at this purported meeting of stockholders of the terminal company were chosen by the three railway companies and certainly were merely their instruments. There can be no question that the controlling, executive officers of the railway companies were fully aware of and approved the action of the meeting; that Hubbell was encouraged to purchase the bonds and stock; that the value of the stock was solely prospective during the existent operating contract; and that this value has largely increased, as the worth of the terminals grew and the contract term diminished. Although the 1889 contract had provided for distribution between them of the entire capital stock of 20,000 shares, they accepted, after the amendments, distribution of 4,000 shares provided

therein. Before the amendments there had been no stock issued, but the corporate organization had been maintained by eight directors chosen by the three railways in accordance with and in the proportions prescribed in the original articles. After the amendments the directors were elected by the outstanding stock, and, in fact, they were not all representative of the railways; no attempt was made by the railways, as such, to exercise the very valuable right of naming, in certain proportions, the directors. The amendments provided that no stock beyond the 4,000 shares should be issued, except by consent of more than seven-eighths of the stock. This provision has been observed. This was a very vital provision, bearing upon the value of the issued stock. It cannot be disputed that the virtual veto of further issue was for the benefit of Hubbell, who then owned one-eighth of the stock (bought less than two months before), and to whom the Wabash purchasing committee at that very time was endeavoring to sell another eighth (later consummated). At that time the terminal company was under contract with the railway companies to apply all of its surplus earning to a reduction of their service bills, thus, during the life of that contract, depriving the stock of all chance of dividends. That contract had then 28 years to run. Yet 3 days before this purported meeting of the terminal stockholders the Wabash purchasing committee offered Hubbell $100,000 of terminal bonds and one-eighth of the stock for $115,000 and accrued bond interest. This sale was consummated after the amendments had been adopted.

The truth seems to be that the purchasing committee of the Wabash was desirous of realizing upon these bonds and stock by sale to Hubbell, who was the dominating influence in the other two railways; that Hubbell was willing to purchase if the control of the railways, as such, given in the articles was removed; the articles were amended, removing Hubbell's objection; the purchase was made. For 17 years thereafter the railways acted in perfect harmony with the articles as amended. During all of that time there was no questioning of their validity. Not until this suit was filed in 1907 was there any such attack. The doctrine of laches comprehends and controls the situation. Neither as shareholders nor as parties contracting with the terminal company can the railway companies thus sleep upon their rights and then in a court of equity enforce such against others who have, to their knowledge, acted upon the belief that such rights did not exist, and have acquired and hold property which has enormously increased in value in the interval. These amendments took away all control by the railway companies, as such, over the action of the terminal company. This would include the rights of approval by them of usage, transfer, or permanent incumbrance of the property, nomination of directors, and all influence of the 1882 contract as embodied in the articles of incorporation. All of these provisions in the articles were for the exclusive benefit of the railways, and they could and did part with them.

Finally, it is urged that it cannot be supposed that these railway companies would bring into being a creature, put into its hands such ownership and control over their property, and endow it with such

powers that it and not they could command the situation. Such a supposition is improbable and here unnecessary. There is nowhere any indication that the railways intended any such result, and yet such, in our judgment, is the result. This unexpected outcome was the product of several circumstances. A very short trial convinced the railways that the 1882 contract plan was not safe nor practical in the use of the terminals. Under that plan as much control as they deemed proper had been vested in that one of them (Des Moines & St. Louis Railway Company) which was most largely interested in the property. The necessity of some neutral outside agency was evident. A close corporation, in which stock and representation on the directorate was assured in proportion to their ownership of the property, naturally suggested itself. The opportunity for reimbursing themselves for outlay in connection with the property was attractive. This could be done through bonds of a terminal company, and yet leave the free use and entire control of the terminals. Such bonds must have value behind them, and there was no other value possible except the property; also, they must acquire the stock of such company and must make payment therefor in value. So they created this agency; they circumscribed its powers with restrictions which made their control of it as complete as legally possible; they contracted among themselves, limiting the transfer of stock by any of them. They thus took every precaution consistent with the objects they had in mind which prudent men could devise to make their control over their creature complete and permanent. They then transferred to it their property and felt secure. ·

For years so complete was this mastery that no stock of the terminal company was issued, although it had acquired the property, issued its bonds thereon, and had sole control over the operation of the terminals. But financial difficulties enmeshed the Wabash, the then holder of the largest interest (one-half) in the stock and bonds. One avenue of relief was through disposition of a considerable portion of such stock and bonds to an individual (Hubbell), who was then influential in the two other railways. Such a sale would seem in effect a mere rearrangement of the interests of the three companies in the terminal company. But it was a vital condition of that purchase, required by the purchaser, that the complete control of the railways over the terminal company should be lessened, so that the purchaser might protect his interests. This was done. It was the severance of those bonds in which lay the control of the railways, as such, over the terminal company. Thereafter, through successive acts, natural enough, and at the time apparently harmless, this removal of control was more completely confirmed; the ultimate result being the entire emancipation of the terminal company from outside government. In course of time a majority of the outstanding stock had passed legitimately and for value to the Hubbells; also they had disposed of their interests in the railways (Northern and Northwestern) to the Milwaukee, retaining for themselves the terminal company holdings. These last two concurring factors inserted into the situation for the first time an unforeseen diversity of interests between the railways and the terminal company.

Thus the railways themselves had, through a series of acts and circumstances extending over many years, gradually let slip from them that exclusive ownership and control which they had at the beginning so much valued and so carefully guarded. The proprietorship and mastery of the entire terminal property, rights, and franchises are represented by the outstanding stock and bonds of the terminal company. All of such stock and bonds are now held by the complainants, or passed through their ownership or that of their predecessors and were parted with for value. They have not lost their property. They have the stock and bonds, or the value they received for them. They have parted with all control not given by the stock or bonds.

Our determination upon the main contention in this case is that complainants, except as bond and stock holders, have no interest in the property of the terminal company and no voice in the control and management of that company.

## Surplus Earnings.

[4] In connection with the management and operation of the terminal properties, sources of income arose aside from the contributions made by the three railways. These sources were switching charges and rental of parts of its property or of privileges in connection therewith. Accumulations of this character now total several hundred thousand dollars. Complainants base claim therefor upon the contract entered into between the terminal company and the railway companies, dated May 10, 1889. The terminal company replies that the contract does not include such moneys. The determination turns, therefore, upon the meaning of that contract. A subsequent contract of July 31, 1897, does not affect this controversy. Those portions of the 1889 contract pertinent to this point are as follows:

"Section 3. Each of said parties of the second part, for itself and its assigns, agrees to pay to said party of the first part a sum of money to be ascertained as follows, to wit:

"(1) There shall be ascertained the amount required to pay 5 per cent. interest upon the mortgage bonds of the party of the first part, one-twelfth of which, less any deduction hereinafter provided for, shall be payable monthly as hereinafter specified.

"(2) At the expiration of each month, or as soon thereafter as practicable, there shall be ascertained the expenses of maintaining and repairing the property of the party of the first part, including the maintenance and repair of tracks, depots, roundhouses, engine houses, etc., during the preceding month. And in like manner there shall be ascertained the taxes, general or special, levied upon or against said property and paid during the preceding month, or to be paid during the next succeeding month, and the insurance, if any, paid during the preceding month, or to be paid during the next succeeding month.

"(3) There shall be likewise ascertained the costs and expenses of every nature connected with the operation of said terminal station, freight and passenger depots, depot grounds, roundhouses, transfers and other properties, which is to include every item of expense or disbursement incurred or made by the party of the first part not hereinbefore mentioned, except the expenses specified in section 9 hereof.

"Section 4. Having so ascertained the monthly aggregate of all the items and sums mentioned in the preceding section, there shall be deducted therefrom the amount, if any, which other railway companies may be under obliga-

tion to pay by virtue of contracts for the use of said property, or parts thereof, for the preceding month, and the remainder shall be paid by the parties of the second part in the proportion that the wheelage of each of said parties bears to the entire wheelage of all said second parties during such preceding month; and it is expressly understood and agreed that in computing wheelage, three narrow-gauge cars shall be taken as the equivalent of two standard-gauge cars, and that the term 'wheelage' as used in this contract means that three narrow-gauge cars are to be accepted as the equivalent of two standard-gauge cars.

"Section 5. If the amount, or any part of the amount, due from any other railroad company or companies for the use of said property or any part thereof, shall not be paid when due, then the sum so due and unpaid shall also, on demand of said first party, be paid to it by said second parties on a wheelage basis as hereinbefore defined."

Section 9, referred to in the above quotation, relates to a different basis of dividing roundhouse expenses and does not alter the meaning of the quotation.

The plaintiffs contend that these "surplus earnings" are made up of items which under the above provisions should have been credited upon their monthly bills. Defendants claim that the only character of credit items intended by these provisions were such as were paid by some other railway by virtue of a contract for the use of the property, and that these items fall without that definition. This latter contention is a strict construction of the exact wording of the contract. It is not in our judgment a fair construction of the spirit of the agreement. This conclusion is based both upon the history of the transaction and upon the meaning to be given this precise language when read in connection with the entire contract.

After the railways had, in April, 1888, transferred the property to the terminal company it was in a position to proceed to carry out its purposes. All of the parties (this for practical purposes at that time meant the three railway companies) evidently realized that something more was needed to definitely define and control the relations of the four companies toward each other. One witness testifies that the moving considerations which led to this agreement were that the 1882 contract had made no provision defining how the interest upon the bonds should be paid, and that the railways thought that roundhouse services should not be paid for on a wheelage basis. Doubtless these two items were in the minds of the parties, but it is quite evident that there was something of greater importance. The very general statement in the articles of incorporation that the terminal company was to exercise all of its powers "in accordance with the terms and spirit of the aforesaid contract entered into on the 2d day of January, A. D. 1882," was too vague to serve as a practical definition of the rights of the parties, or as a guide to the terminal company in the conduct of the business of the railway companies. Besides it was vitally necessary to settle the terminal stock rights of the railways. Therefore the parties wisely determined, as set out in the preamble of the 1889 contract, that—

"for the protection of the parties hereto and their assigns, it is important that the rights, duties, and liabilities of each in regard to the whole subject-matter of said terminal facilities, including their use, care, control, rental, taxes, expenses, renewals, insurance, and repairs, shall be stated and defined."

The contract of 1882 had provided a plan for financing the terminal project. This plan contemplated that the railway companies would provide the terminal properties; that the expenses of control, supervision, maintenance (including taxes) and (generally speaking) improvements should be met by them on a wheelage basis. They expected at that time to procure the service at cost and divide that cost in accordance with actual usage. This idea that the terminal service for which they were taking all these steps would be furnished them at cost passed into the 1889 contract. For several years after that contract became effective the monthly bills rendered by the terminal company and paid by the railway companies set forth specifically these items of rentals and switching charges from outside sources as credits upon the expenses, of which the balance was divided between the three railways on a wheelage basis. February 11, 1891, a directors' meeting of the terminal company ordered—

"that the rents collected for the use of the company's real estate, and the switching charges paid in, be credited on the bills of the different tenant companies occupying this company's terminals, giving to each company its share ascertained by wheelage."

About a year later, January 7, 1892, the same body ordered a discontinuance of this practice. By its terms this discontinuance was intended to be temporary, and was for the purpose of providing a fund "with which to purchase supplies and pay current bills which come in before it receives its monthly revenue from the tenant companies." When the auditor of the Wabash noticed the absence of such credits from the bill for the month preceding the above last order he inquired of the terminal company superintendent, who wrote as follows:

"Replying to yours of the 1st inst., in regard to the allowance for switching, rentals, etc., that should be made on our bills for the months of December and January, I have to say, that at a meeting of the executive committee, held January 7, 1892, it was decided not to distribute these collections for a period of time, until the Des Moines Union Railway Company could accumulate a small fund for working capital. I presume this will continue in effect until January, 1893. You will be furnished each month a statement showing the amount of this rental, *and your proportion of the same* [italics ours], so you can make a charge against the D. M. U. Railway and carry it on your books, as you see fit, for future adjustment."

Also, in the annual report made by the terminal company to the Executive Council of the state of Iowa for taxation purposes for the years 1888, 1889, 1890, 1892, and 1893 was the statement that the terminal company was "simply a representative company, acting as an agency for" the railway companies, "performing all necessary work for them, and charging each at actual cost its due proportion thereof incurred." The report for 1894 differs in some other, but not in this, respect, except that it includes another railway, and says that it "performs certain services for these companies, and collects from them as rental, and for such services, the aggregate amount of its expenses, which expenses are paid by the several railway companies in proportion to the use of the property and services rendered, as provided by contracts existing between this company" and the other companies. Thus the history of this provision of the contract, and of the view

taken of it by the parties themselves before any antagonistic motives or interests had intervened, shows that all revenue of the terminal company was to be credited on the bills of the railway companies. A careful consideration of the entire contract itself leads to the same conclusion.

Therefore the surplus earnings should be returned to the railway companies. For that purpose an accounting should be taken to determine what sum should go to each, calculated upon monthly wheelage basis.

## Usage After May 1, 1918.

When the present operating contract is ended, the rights of the parties respecting the use of the terminals by the railways are those which spring from their nature as carriers and their physical and business relation to each other as carriers in and entering a large terminal. These are that the terminal company must furnish its full terminal facilities in so far as reasonably necessary and required by the railways, and they will pay therefor such reasonable sum as may be agreed upon between the terminal company and each of the railways, or, in default of such agreement, as may be fixed by the proper public tribunal.

## Conclusion.

The decree should be modified. It should state the complete title to this property in the terminal company, and that the only interest of the railways in the property or the management of the corporation is such as flows from stock ownership, that the surplus earnings belong to the railways, and a master should be appointed under instructions to ascertain the part due each upon a wheelage basis.

It is so ordered.


HOOK, Circuit Judge (dissenting in part). I concur in the award to plaintiffs of what is called the surplus earnings of the terminal company, not only for the particular reason given, but also for a broader one, arising from the other branch of the case.

I am unable to agree to the foregoing opinion upon the main controversy, and will state my reasons in a general way. The railroad companies organized the terminal company, and invested it with the legal title to their property, including integral parts of railroad lines and appurtenant franchises, solely for the more convenient and better performance of their public duties. It is open to question whether the most important of the conveyances could lawfully have been made, except for that specific purpose. That purpose was fundamental, not temporary or casual, and it determined the character of the terminal organization. The terminal company was not incorporated by individuals as an independent enterprise for personal profit, and its stock was not put upon the market as that of a financial venture. The contract of 1882 between the railroad companies foreshadowed the terminal company in express words, and when that company was chartered it took the place of the individual trustee provided for by the contract. That fact is too plain for discussion. The change to a cor-

porate trustee was solely for reasons of convenience. It was one of method or form, but not of underlying, essential substance.

As regards the legal title to the property, the terminal company became the trustee of the railroad companies that organized it and of such others as might thereafter be admitted to joint beneficial ownership. The beneficiaries, present and future, were what are commonly called proprietary or constituent companies. Each of them owed a duty to the others that it would not at any time so deal for itself or with its own proprietary interest as to impair or destroy the joint relation among them or the character of their common organization. Not only did the terminal company hold the legal title as trustee, but in the operation and maintenance of the property it was an agency of the proprietary companies for the performance of their railroad functions. This was accurately expressed in a sworn declaration by one of the individual defendants in 1892 when president of the terminal company. He averred that it was "simply a representative company, acting as an agency at Des Moines for the Wabash Railroad Company and the Des Moines, Northern & Western Railway Company, performing all necessary work for them, and charging each, at actual cost, its due proportion for the expense thereby incurred." The Des Moines, Northern & Western was the successor of two of the original proprietary companies.

In both aspects of its position towards the proprietary companies the terminal company was in a high sense their trustee, and according to salutary principles it was bound to maintain the integrity of that relation. Being itself a corporation, its fiduciary obligations and disabilities rested equally upon its officers, through whom alone it could act. The limitations upon the right of a person in such a capacity to act for his personal benefit with respect to the subject of the trust are familiar. Never are they less than that the dealing must be open, avowedly at arm's length, and without connivance or concealment. The individual defendants, one or the other, or both, were, at all the times material in this case, officers and directors of the terminal company. The conclusion of my Brothers, briefly stated, is that by a series of transactions occurring in a long course of years the original character of the terminal company was gradually changed into that of an independent corporation, and that the control of it was lost by the railroad companies and was acquired by the individual defendants, who were its officers. But they say:

"There is nowhere any indication that the railways intended any such result, and yet such, in our judgment, is the result. This unexpected outcome was the product of several circumstances."

In other words, the proprietary companies were not cognizant of the trend of the circumstances, and the result held to follow, though unexpected, and not intended by them, is enforced, because of a legal presumption of intention of natural consequences of acts, regardless of intention in fact. The circumstances relied on do not appear to me to have the significance attributed to them; but, were it otherwise, the presumption should not be so broadly applied to the case of a trust, the destruction of which is claimed by those subject to the disabilities

of trustees dealing for themselves. The excerpt quoted above touches the quick of this controversy. In my opinion the various transactions thought to produce a·result so unexpected and unforeseen should be severally examined in the light of the surroundings at the time they occurred. If in one aspect they were then consistent, or not apparently inconsistent, with the frequent and studied declarations of the object of the .terminal organization, and that view was then reasonably entertained by the railroad companies, that view should prevail in a court of equity, rather than a shrewder one tending to a conclusion in favor of participants who were bound in good conscience to the contrary.

An argument is made upon the issue by the terminal company of bonds on the property and the necessity that it should have had the title to enable it to make the mortgage. Of course it had to have title as complete as the giving of the mortgage required, but there is nothing in that inconsistent in any degree with the existence of a trust relation between it and the proprietary companies. The mortgage is still afoot, and in this case no rights are asserted under it. Its effect upon the question before us is not different from that of a joint mortgage by the proprietary companies upon properties severally owned by them, but committed to a common use, or that of an authorized mortgage by an individual trustee named under the contract of 1882. The proprietary companies were fully justified in believing that the changes and amendments in the charter, etc., of the terminal company, now relied on as making for its complete independence, were for the sole purpose of giving it the conventional dress of a corporation that has put forth an issue of bonds. That was why suggestions originating within the terminal company were so readily agreed to by them, and that is why the result so contrary to their vital interests, now held to follow, was unforeseen.

I question whether property and rights of great value are lost in that way, except in circumstances concededly not present here. The very suggestion that a great railroad system, like the Wabash, for example, had unintentionally and unexpectedly lost its proprietary interest and right to use extensive terminals in a large city, to the establishment and upbuilding of which it was a party, and to which it had contributed property acquired for railroad purposes by eminent domain and public grant, is so unusual as to impose upon those who make it a heavy burden of law and fact. Questions like these naturally suggest themselves: Who got the property of the railroad company, and deprived it of its right of entrance into the city? How did they do it? What were their relations to the railroad company? Who represented the railroad company in such an important matter, and what authority did they have?

After the conclusion is reached that the terminal company had by gradual action thrown off its trust character and had become independent, attention is directed to the transactions in its stock. The power asserted by the individual defendants to control the terminal company and thereby to exclude the plaintiffs from the use of the terminals rests upon their possession of five-eighths of the issued capital stock.

There is, however, abundant proof that the stock of that company was intended only to represent the interests of railroad companies actually using the terminal facilities and as a method of apportionment among them. The stock was not intended as a source of personal or individual profit apart from railroad use. Stock ownership and terminal use were inseparable. I know of no public policy or rule of law against such a status of corporate stock or its enforcement as between the parties who established it. If it were formally expressed in the corporate charter, the world would have to take notice. But as between the parties themselves, those participating and having actual knowledge, internal evidence may disclose it. It should always be in mind that in this case there are no innocent purchasers relying upon public records. The contract of 1882 specified the proportional interests of the three original railroad companies, and foreshadowed the organization of the terminal company to take the place of an individual trustee. In 1884 the terminal company was organized for the expressed purpose of carrying out the contract. My Brothers see in the articles of incorporation some evidence of a departure from the trust and the beneficial relations, but it seems to me that the intention to maintain them was asserted and reasserted as definitely and positively as words would permit.

While, as customary, the charter made provision for a capital stock, the connection between the distribution and future ownership of such thereof as might be issued and the railroad use of the property was manifested, not only in that instrument, but afterwards in many ways by both the railroad companies and the terminal company. The limitations of an opinion will not admit of a recital of this evidence in detail. It is in the record, and there is much of it. In 1887, three years after the terminal company was incorporated, when the parties began to convey to it the legal title, the directors of the predecessor of the Wabash Company adopted a resolution directing its president and secretary to execute a deed conveying "all its real estate, rights of way, franchise, roadbed, and other property of said company lying and being in the city of Des Moines, east of Farnham street, whether the same was acquired by grant from the city of Des Moines, or by purchase or condemnation," and, it was added, "this resolution being offered for the purpose of carrying out the contract of date January 2, 1882," etc. One of the individual defendants, as secretary of the directors' meeting, recorded the adoption of the resolution. The Wabash Company was then the real party in interest. The conveyance executed by the officers so authorized, the individual defendant being one of them, was in form a warranty deed, but certainly the resolution of authority fixed the effect of the conveyance for the parties and those who afterwards dealt with knowledge of the facts. Mere executive officials of a railroad company cannot, upon their own initiative, convey away parts of its road and franchises. And, were it necessary to be determined here, it would be an interesting question how far its representatives in a terminal company, organized and holding title like the one here, could do so by consenting to a vital change of its character, or even by a disposal of its stock, without express au-

thority of their principal manifested in the usual corporate way. The 30-year contract of May 10, 1889, between the terminal company and the proprietary companies, was authorized as supplemental to the contract of 1882, and in a preamble it was recited that in pursuance of its charter it acquired and owned a railway. The charter was that of 1884 into which the contract of 1882 was written.

One other matter bearing on this phase of the case may be mentioned. The effort to purchase stock began in 1888. The property of the Wabash Company, including a half interest in the terminal stock not yet issued, was then in a transitional state in a foreclosure proceeding, being held by a purchasing committee. One of the defendants wrote Mr. Ashley, the president of the Wabash Company, and also a member and the secretary of the purchasing committee, saying he had been asked whether half of that stock interest, one-fourth of the whole, could be bought. Mr. Ashley replied favorably, adding:

"But I have always supposed that it would be necessary to confine the sale to such railway companies as would be interested in the station."

Also:

"Was there not an understanding or agreement as to the sale of the stock when the terminal company was formed, and would it not be prejudicial to the interest of the whole to part with the stock to outsiders?"

The defendant replied, agreeing with him and mentioning some railroads in whose interest inquiries had been made. The purchase was made in 1890. It was in 1892 that the other individual defendant made the sworn statement that the terminal company was "simply a representative company, acting as an agency" for the railroad companies. About two months after the first sale, the purchasing committee sold an additional eighth of the stock to the defendant. In a letter during the negotiations Mr. Ashley wrote him:

"It must be understood, of course, that a one-eighth interest in the capital stock shall be sufficient to represent a proprietorship in the company according to the understanding we had when you were here."

The phrase "proprietorship in the company" is not commonly used to describe the stock of an ordinary corporation. Moreover, the defendants, being substantially interested in the proprietary companies, other than the Wabash, had been endeavoring to induce other railroads to come into the terminal company. They were, one or both, also officers of the terminal company. It would naturally be assumed that in dealing with them they were acting in the railroad and terminal interest, as distinguished from that in which they now assert control. The record shows that it was common practice in correspondence to address them personally on subjects of corporate concern. In fact, the three-eighths of the stock bought from the Wabash purchasing committee was transferred to and became the property of the Des Moines Northern & Western Railway Company, into which the two other companies were merged. That was in 1892. The Des Moines Northern & Western then owned seven-eighths of the terminal stock and the Wabash one-eighth. As has already been observed, the terminal company was declared in that year to have been simply a rep-

resentative agency. Early in 1893 a similar declaration was made on behalf of that company. The Des Moines Northern & Western was financially dominated and officially controlled by the individual defendants. In the fall of 1893 their company pledged five-eighths of the terminal stock to them as collateral to some indebtedness. In January, 1894, the pledged stock was by agreement applied as part payment to a small amount, and they have since held it.

The next annual sworn statement on behalf of the terminal company to the Executive Council of the state of Iowa illustrates the transforming effect upon the character of the corporation which a mere transfer of its stock is supposed to have. In February, 1894, it was declared that the terminal company was the owner of the property; that it leased it to the railroad companies, performed services for them, and collected a rental. My Brothers, adopting that theory, say that the ultimate result was the entire emancipation of the terminal company from "outside government." According to the decision, the proprietary companies became outsiders, without right, after the expiration of the operating contract of 1889, to use the terminals, contrary to the will of the holders of five-eighths of the stock, except upon the order of some public administrative board in Iowa, if there be one with jurisdiction. I do not think the stock in the hands of the defendants should be destroyed, or its true value in the scheme or plan of the terminal organization impaired, but that it should be actively operative and profitable only when transferred to and held by railroad companies which use the terminals and contribute in that way to the object of their creation. There are four or five other important railroad systems entering Des Moines, besides those of the plaintiffs.

There is little conflict in the evidence. The difference between my Brothers and myself is not so much about the facts as their significance. They put emphasis upon the corporate cover of the terminal company and perceive a drift to complete self-sufficiency and independency from the very moment of incorporation. But the doctrine of a corporate entity separate and apart from the persons composing the corporation is after all a mere legal fiction, established for convenience and to serve the ends of justice. It does not go beyond that. In equity the shell artificially assumed is not impermeable. The court will look through it and regard the kernel, and whenever justice requires will hold the stockholders as the corporation. That is being constantly done in equity in determining public rights as affected by the corporate association of particular individuals and the rights of the individuals among themselves and with respect to their organization.

But, however the above may be, it seems to me that the less measure of relief granted by the trial court cannot be denied the plaintiffs. It is that they were entitled to a continued use of the terminal properties and that the court would determine the terms and conditions if the parties were unable to agree. That is the matter of defendants' appeal. Whenever a definite right claimed by a railroad company to use specific property of another is of contractual origin, as where it

is a condition of the franchise of the owner or is founded upon conventional agreement, the question of the existence of the right and its extent and limitations is a justiciable one, and the claimant may invoke the aid of a court of equity for its establishment and enforcement. Similarly, when the right is upon reasonable terms and conditions, the court may determine them if the parties do not agree. Both phases of this subject have been so decided in the cases, familiar in this circuit, of the Union Pacific Bridge, at Omaha, and the Wabash right of way and tracks, at St. Louis. If the right of use exists, reasonable terms and conditions are implied, in the absence of recital or stipulation about them. In view of the admitted history of the terminal company, the plaintiffs, merely as minority stockholders, have a right to the use of the terminals and upon reasonable terms. The right is not of that general nature which requires an appeal to some administrative board for the enforcement of the public policy of the state applicable to all railroad companies, but is essentially contractual. It could not reasonably be said that, had the contract of 1889 not been made, two of the original companies holding a majority of the stock might have excluded the third from the use of the terminals and defeated its appeal to the courts. The individual defendants have no greater right or power.