**DES MOINES TERMINAL CO. v. DES MOINES UNION RY. CO. et al.**

**CHICAGO GREAT WESTERN R. CO. et al. v. DES MOINES UNION RY. CO. et al.**

**DES MOINES UNION RY. CO. et al. v. DES MOINES TERMINAL CO. et al.**

Nos. 8990–8992.

Circuit Court of Appeals, Eighth Circuit.
Aug. 10, 1931.

Rehearing Denied Oct. 28, 1931.

618

J. G. Gamble, of Des Moines, Iowa (R. L. Read and Gamble, Read & Howland, all of Des Moines, Iowa, on the brief), for Des Moines Terminal Co.

Donald Evans, of Des Moines, Iowa (W. D. Eaton and J. C. Pryor, both of Burlington, Iowa, and Carr, Cox, Evans & Riley, of Des Moines, Iowa, on the brief), for interveners Chicago, B. & Q. R. Co. and Chicago Great Western R. Co.

N. S. Brown, of St. Louis, Mo., and John N. Hughes, of Des Moines, Iowa (Homer Hall, of St. Louis, Mo., and Hughes, O'Brien & Faville, of Des Moines, Iowa, on the brief), for Des Moines Union Ry. Co. et al.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and DAVIS, District Judge.

KENYON, Circuit Judge.

Three appeals are here involved. The Des Moines Terminal Company (hereinafter designated the Terminal Company) brought action in the district court of Polk county, Iowa, at the May term, 1923, against the Des Moines Union Railway Company (hereinafter termed the Union Company), Chicago, Milwaukee & St. Paul Railway Company, and Wabash Railway Company, to quiet title in it to certain railway terminal property in Des Moines, consisting of rights of way upon which were located railroad tracks, switches, and other terminal facilities. The cause was duly removed to the United States District Court, and an answer and cross-bill was filed by defendants, in which they asserted that the Union Company was the owner in trust for the benefit of the cross-petitioners, the Milwaukee Railway Company and the Wabash Railway Company, of all the tracks, rights of way, and facilities claimed by the Terminal Company; that the Terminal Company had acquired them as the result of a scheme and conspiracy entered into between F. M. Hubbell, F. C. Hubbell (his son), and H. D. Thompson (brother-in-law), as officers and stockholders of the Union Company, to enrich themselves out of the trust estate, of which the Union Company was trustee; that the transactions of said parties were in violation of their duties as such officers and trustees, and cross-petitioners asked that the tracks and right of way and other terminal property claimed to be owned by the Terminal Company be decreed to be a part of the trust estate held by the Union Company as trustee for the exclusive use of cross petitioners.

In reply the Terminal Company denied any scheme or conspiracy on the part of F. M. Hubbell, F. C. Hubbell, and H. D. Thompson, to enrich themselves out of trust property; further that, in an equity suit in the District Court of the United States for the Southern District of Iowa, in which the Milwaukee and Wabash Companies were complainants and the Hubbells were defendants, together with the Union Company, complainants filed an amended bill on May 12, 1909, in which they set up part of the same dereliction they now assert in this case; that they had at that time full information of the facts and are estopped to now raise these questions. Waiver and laches are also asserted.

The Chicago Great Western Railroad Company and the Chicago, Burlington & Quincy Railroad Company intervened in the action, claiming the right to possession of the so-called terminal tracks and properties of the Terminal Company by virtue of a lease from that company of date June 3, 1921. We shall hereinafter refer to these two intervening railroads as interveners.

Eight weeks of time was occupied in the trial of this case in the District Court. The facts are intricate and involved, and show a much scrambled condition of affairs. To outline them in detail would make a book. A mass of records, correspondence, and evidence is presented to us. The legal questions discussed are numerous. The trial court held that Messrs. Hubbell, who were in control of the Terminal Company, had violated their trust in developing the system of tracks, known as the Terminal Company's system, for their own benefit and profit, and in failing to carry out the purposes for which the Union Company was organized, but held that any right on the part of the Union Company or the Milwaukee and Wabash Companies to claim ownership of the Terminal properties had been waived; that the Union Company was not entitled to have transferred to it as trustee for the Milwaukee and Wabash Companies ownership of these properties. It held that, while the Union Company and the proprietary roads were not in posi-

tion to claim ownership in the railroad properties of the Terminal Company by reason of waiver, they were entitled to claim as to said properties the exclusive use thereof upon reasonable terms to be fixed by the court if no agreement should be made covering the same. It held that the finding of waiver and abandonment by the Union Company and the proprietary roads of the right to claim equitable ownership of the Terminal properties was not inconsistent with the right to have established an implied parol arrangement for the exclusive use of the tracks by the Union Company enforced upon reasonable terms.

As to interveners, the trial court held they had acquired their rights by lease with the Terminal Company under such conditions as to put them on inquiry and to require them to use reasonable diligence to ascertain the rights of the Union Company, and that the lease to them was void. The main relief granted by the trial court is expressed in this order: "It is therefore the Order and Judgment of this Court that all of the tracks of the Des Moines Terminal Company and the real estate used in connection therewith, and the real estate, if any, now under lease to the Des Moines Union be impressed with a trust in favor of the Des Moines Union Railway Company for the exclusive possession and use thereof by the Des Moines Union Company upon reasonable terms."

As the Hubbells are the parties around whom this controversy rages it will be well to get clearly in mind their relationship to the situation. The Des Moines Union Railway Company was incorporated in 1884. F. M. Hubbell was one of the incorporators. He was secretary and a director of said company from the date of its incorporation until April 5, 1921. His son, F. C. Hubbell, was president and director of the company from 1892 until April 5, 1921, when he became president of the Terminal Company. Mr. H. D. Thompson, a brother-in-law of F. M. Hubbell, was director and treasurer of the Union Company at the time the Terminal Company was organized, and so continued until April 5, 1921.

The Des Moines Terminal Company was incorporated in May, 1902, by F. M. Hubbell, H. D. Thompson, and C. Huttenlocher (an employee of F. M. Hubbell). F. M. Hubbell was by the articles of incorporation made the first president of the Terminal Company, H. D. Thompson, vice president, and Mr. Huttenlocher, secretary and treasurer. They also comprised the first board of directors. The Frederick M. Hubbell estate is a trust estate created by Frederick M. Hubbell. F. M. Hubbell Son & Co., Inc., is a corporation which took over the real estate business formerly conducted by the partnership of F. M. Hubbell & Son. The Frederick M. Hubbell estate was a stockholder of the Terminal Company, as was F. M. Hubbell Son & Co., Inc. The Hubbell interests and Thompson were in complete control of the Terminal Company during its entire existence and it was entirely a Hubbell enterprise. The stock of F. M. Hubbell Son & Co., Inc. was owned at the time of trial of the original case, one-third by H. D. Thompson, one-third by F. C. Hubbell, and one-third by the trustees of the F. M. Hubbell estate. Contracts were made between the Terminal Company, signed by F. M. Hubbell as president, with the Union Company, signed by F. C. Hubbell, as president.

The dominating personality in the Union Company until 1921, and in the Terminal Company from its organization, was Mr. F. M. Hubbell. We shall refer to the various Hubbell enterprises, individual and collective, as the Hubbell interests.

The genesis of the Des Moines Union Railway Company is this: On the 2d day of January, 1882, an agreement was made in the city of New York between the Des Moines & St. Louis Railway Company, the Des Moines Northwestern Railway Company, and the St. Louis, Des Moines & Northern Railway Company, and several individual signers, to organize a terminal company in Des Moines to be known as the Des Moines Union Railway. The purpose is expressed in subdivision 8 thereof, as follows: "It is understood and agreed that spur tracks shall be built connecting the said terminal grounds with such manufactories and other sources of trade in and about the City of Des Moines, as afford sufficient opportunity for profit by so doing, and that all of said tracks shall be adopted for use for both broad and narrow gauge (trucks), provided that in case either of said Companies shall deem the construction of any of said tracks as not advantageous to its business, the question of constructing said tracks, and which of the parties hereto shall pay therefor shall be determined by arbitration."

Mr. F. M. Hubbell did not sign this agreement, but was active in organizing the Union Company. He was holding offices in a number of these roads and was regarded by the Wabash, which in fact controlled one of the signatory roads, as their representative in Des Moines. From 1882 to 1888 the terminal

properties were largely operated by the Wabash, and Mr. Hubbell was participating in acquiring the property for the Union Company intended to be used for terminal purposes. The respective railway companies entering into said agreement, and to carry out its provisions, caused to be incorporated the Des Moines Union Railway Company.

The articles of incorporation were signed on December 10, 1884, by J. S. Polk, F. M. Hubbell, and J. S. Runnells, although the corporation did not actively function until 1888. The object of this corporation is shown by article II of the articles of incorporation, which is as follows:

"The general nature of the business to be transacted shall be the construction, ownership, and operation of a railway in, around and about the City of Des Moines, Iowa, including the construction, ownership and use of depots, freight houses, railway shops, repair shops, stock yards, and whatever else may be useful and convenient for the operation of railways at the terminal point of Des Moines, Iowa, as well as the transfer of cars from the line or depot of one railway to another or from the various manufactories, warehouses, storehouses, or elevators to each other or to any of the railways or depots thereof now constructed or to be hereafter constructed in or around said City of Des Moines, and such corporation shall possess all the powers conferred upon corporations for pecuniary profit by Chapter 1 of Title IX of the Code and the amendments thereto.

"All the powers exercised by this Company shall be in accordance with the terms and spirit of the aforesaid contract entered into on the 2nd day of January, A. D. 1882, by and between the Des Moines and St. Louis Railroad Company, the Des Moines Northwestern Railway Company, the St. Louis, Des Moines and Northern Railway Company, Jas. F. How, Jas. F. How, Trustee, and Granville M. Dodge."

We need not follow through the various transactions that made the Wabash and Milwaukee Companies the successors and assigns of the companies entering into the contract of January 2, 1882. It is sufficient to say that the Milwaukee is the remote successor to the Des Moines Northwestern Railway Company and the St. Louis, Des Moines & Northern Railway Company, while the Wabash is remote successor of the Des Moines & St. Louis Railway Company. The rights of the various railroads instrumental in forming the Union Company were transferred to it.

Prior to May, 1888, F. M. Hubbell had acquired title to a large area of land in Des Moines designated in these proceedings as the factory district which he intended to develop industrially. It was located south of Market street, and may be described as a tract approximately three-fourths of a mile long east and west and one-half mile wide, lying south of the right of way of the Chicago, Rock Island & Pacific Railroad, bounded on the north by Market and Elm streets, on the east and south by the Raccoon river, and on the west by what is now the 100-foot right of way of the Union Company, secured from F. M. Hubbell in 1890. It is a question of some dispute whether Mr. Hubbell had acquired all of the lands in the factory district prior to 1888. The Union Company contends that not more than one-fifth of the district had been bought at that time. However properties had been purchased there for the purpose of the terminal prior to that time and held in trust by one How, as trustee. The property involved in this controversy is principally located in the factory district, though some tracks are in other parts of the city, viz., east Des Moines. The Union Company endeavored to extend its operations as a Terminal Company into this district, and in 1890 bought several strips of land from F. M. Hubbell to be used as rights of way. One strip so purchased as part of the development plan in the district was known as the 100-foot strip and extended from Market street south to the Raccoon river. On this a number of tracks were built. As a part of the consideration therefor, the Union Company was to construct an embankment to protect the factory district from threatened overflow from the Raccoon river. Tracks used as connections for the Chicago, Burlington & Quincy, and other roads, were constructed. The Des Moines Union grew until it extended across the city of Des Moines from east to west about five miles, with an extensive system of trackage. It constructed a union depot occupied by many railroad companies. Exhibit 1, introduced in evidence, is a plat showing the tracks and property of the Des Moines Union in the factory district prior to the organization of the Terminal Company in May, 1902. It shows that many tracks had been constructed therein by the Union Company, such as tracks 87, 98, 100, and 103, appearing thereon. These led from the tracks on the 100-foot strip or connected with such tracks and reached the very heart of the factory district, evidencing the purpose to extend the union

into this territory in accordance with its franchises. Right of way deeds were made by F. M. Hubbell and wife to the Union Company conveying rights of way for tracks 87 and 103, which will be referred to hereinafter. A 2,000-foot strip was conveyed by F. M. Hubbell to the Union Company April 1, 1889, which was entirely within the factory district, and was to be used in the development of the Union Company's terminal facilities. In 1902 the Union Company was adequately serving some eighteen industries that had been established in the factory district, and had sufficient trackage so to do. In 1893 the Messrs. Hubbell and Thompson had acquired five-eighths of the capital stock of the Union Company. Outside of eight qualifying shares the Milwaukee and Wabash owned the balance. As minority stockholders of the Union Company the proprietary roads had little to say in its management. In 1889 they made an operating contract with the Union Company for the use of the terminal properties for a long period of time.

From the organization of the Des Moines Terminal Company in 1902, up to April, 1921, the Hubbell interests had complete control of both companies. There was no uniform system in the development of the factory district, but it went continuously forward. We cannot set forth the situation as to each specific track. Some were constructed by the Union Company and the Terminal Company billed on for the cost thereof. As to others, the Union Company furnished the labor merely, or material, and then billed on the Terminal for the same. Some of the tracks constructed by the Union Company were taken over by the Terminal Company by reimbursing the Union Company for the cost of material and labor expended. Some were purchased by the Terminal Company from the Union Company, and others constructed by the Terminal Company out of its own funds. Rights of way were in some instances conveyed by deeds from the various Hubbell interests, in others secured by leases from the Hubbell interests for short periods of time. In some instances the Union would own the connecting track between two sections of the Terminal Company tracks, and vice versa. Beginning about 1906 the Terminal Company charged the Union Company a trackage or switching charge for every car switched over its tracks, which brought large sums to the Terminal. Fifteen thousand cars were switched over Terminal tracks by Union Company for year ending February 28, 1921.

Some part at least of these funds so collected was used by the Terminal Company in constructing additional trackage.

Exhibit 3 in evidence shows a vast network of tracks, switches, spurs, and terminal facilities as they existed in 1921 when the Hubbells were ousted from control of the Union Company following the decision of the Supreme Court of the United States. Mr. Morgan, engineer of the Union Company, testified as to the system of trackage as follows:

"Q. They were operated, weren't they, by the Des Moines Union Railway Company as one unified system? A. Yes sir.

"Q. Was the terminal system laid out by you as an engineer having in mind that it would be a unified system of terminal railway in that district? A. Yes sir. The engineering was done so that it could be operated by one company and the tracks were so constructed and operated.

"It could economically be operated as a unified system of Terminal tracks.

"Q. Was it during the whole time that it was operated by the Des Moines Union, in your judgment, operated economically as a unified system of railway terminal in Des Moines? A. Yes sir.

"The tracks were constructed so that they could be operated by the Des Moines Union and were so operated during 1902."

As illustrating the method in which the construction of tracks and the general development were carried on, we refer specifically to a few of the many tracks. The leading track constructed was what was known as the Dike track, which was built in the winter of 1903 and 1904 along the northerly bank of the Raccoon river from the 100-foot strip to Seventh street. The factory district could best be served by a main lead track at the south, from which spurs could be built, as the northern end of the district was congested. Mr. Morgan laid it out with the view of making it a lead track. It is designated in the evidence and on the plats as a main track, and it was the plan, as shown by Mr. Morgan, to use this track as the key track in the factory district. He testified the work was done at the request of Mr. F. M. Hubbell. It was necessary in its building to secure a crossing contract with the Chicago, Burlington & Quincy Railroad Company. This was made in the name of the Union Company, and such contract is still in force. Reconstruction of the same was paid for by the Terminal Company. There was much filling to be

done, and the dirt for the embankment was mainly secured from excavations at Allen's Bluff. The Hubbell interests furnished dump cars, the steam shovel, and the ties for the track. Mr. Morgan testified: "My search shows F. M. Hubbell Son & Co. paid $2,535.-42 toward the expense of this work and furnished the dump cars. The Des Moines Union paid the remainder of the cost and in addition thereto furnished the engines, trackage and administration. Part of the figures were obtained from the Auditor's office in the bills and in the bill books and other sources of record of the Des Moines Union. The items with reference to what Mr. Hubbell paid were obtained from our bill books. The larger items with reference to excavation at the Bluffs and filling on the dike were kept under my supervision. I found no other items that Mr. Hubbell had paid except those I have stated."

The right of way for the Dike track was conveyed by the trustees of the Hubbell estate to the Terminal Company. According to Mr. Morgan's testimony the excavating at Allen's Bluff and constructing the dike embankment for the track, the filling on the 100-foot strip, and for a short track known as Parker track, cost $11,049.32, originally paid by the Union Company, except $2,535.42, paid by Hubbell Son & Co. The part paid by the Union Company was billed on the Terminal Company and paid by it.

There was a twofold object in the construction of the Dike track, i. e., to serve as a lead track and also to protect the district from floods, which in 1902 had wrought great devastation. The result of this transaction was that when it was all over the lead track necessary to the proper development of the factory district, though constructed largely by the Union, had become property of the Terminal Company. Its importance is shown by the testimony of Mr. Morgan: "The industries in the factory district south and east of the Chicago, Burlington & Quincy Railway were served, until about 1914, by this main lead No. 87 before they were connected with the dike track. In 1914 track No. 87 was connected with the dike track. It was done by extending No. 87, southerly and curved to the west connecting with the dike track west of 9th Street." Under the fiduciary relationship of the Hubbells to the Union Company the Dike track should have been a part of its property.

Another track known as No. 7 was the first track in the district placed in the name of the Terminal Company. As to this track

Mr. Morgan's testimony is interesting as it shows the general method pursued in building tracks in the district. He says: "Track No. 7 is a Terminal track which was constructed in 1902 connecting with the Des Moines Union track on lot 4, and with the main lead across 9th Street which is track No. 87 of the Des Moines Union and connecting near the 100-foot strip, and paralleling the C. B. & Q. railroad, and the Des Moines Terminal has title to track No. 7 and owns the right of way. Track No. 7 was built by the Des Moines Union and then the Des Moines billed on the Des Moines Terminal for the materials used for the construction of the track and the labor. It was constructed in August, 1902." The only access the Union Company had to its own track 88–a was over the Terminal track No. 7. Nor was there access to Terminal track No. 7 except by going over a Union track. This is typical of many situations in the district.

Thirty-two of the tracks of the Terminal Company were joined onto the Union tracks, forming a part of the general system of terminal tracks, and being in fact mere extensions of tracks of the Union Company. There were also some tracks in East Des Moines constructed under the same kind of arrangement. Twelve tracks in the district were constructed by the Union Company between May, 1907, and January, 1920, on rights of way leased to the Union Company by the Hubbell interests and conveyed in most instances thereafter to the Terminal Company.

According to the testimony of Mr. Hahnen, an employee of the auditor's office of the Union Company, the cost of constructing the Des Moines Terminal tracks was $134,000. There is no need, we think, to more specifically set forth or group these various tracks and their construction and the method of payment therefor. Sufficient has been stated to visualize the method carried on between the Union Company and the Terminal Company.

It is evident from the plat, Exhibit 3, that this great system of trackage could be operated only as a unified system. There was no need of two terminal systems in this district, and the tracks were so constructed as to be interdependent upon and interrelated to one another. Each track in the district fits into the system.

After the construction of the Dike track the Terminal Company charged the Union Company $1 for every carload of freight switched over any Terminal track. Mr. Wagner, superintendent of the Union Company, testified that Mr. Hubbell directed him as

to the collection of the trackage charge. The total payment so made, according to the evidence, was approximately $147,267.17. They were made, not by virtue of any specific contract, except an understanding between F. M. Hubbell, as president of the Terminal Company, and his son, F. C. Hubbell, as president of the Union Company. These payments were not authorized by the board of directors and were charged against surplus earnings, or a special account of switching revenues.

In the year 1907 an action was brought by the Chicago, Milwaukee & St. Paul Company and the Wabash Company against the Des Moines Union Railway Company, F. M. Hubbell, F. C. Hubbell, and F. M. Hubbell & Son, defendants, asking that the Union Company be declared to be a trustee holding in trust for said railway companies the terminal properties in the name of the Union Company. That case reached this court (254 F. 927), and it was held that the Union Company owned the legal title, and that the interest of the railroad companies was only that represented by their stock. The Supreme Court of the United States (254 U. S. 196, 41 S. Ct. 81, 65 L. Ed. 219) reversed the decision of this court, and held that the Union Company was a trustee holding the property in trust for the railway companies, and that the fiduciary character of the Union Company extended to its officers and directors. In 1909 an amended bill of complaint was filed in that suit, which included a paragraph of claimed importance here, viz., No. 37, which is as follows:

"And your orators further complain of the defendants Frederick M. Hubbell and Frederick C. Hubbell, and as a ground for still further and other relief represent and show to the court:

"That the defendants, Frederick C. Hubbell and Frederick M. Hubbell, while being respectively President and Secretary of the Terminal Company, and after your orators became the successors in interest of the original proprietary railroad companies without authority from the Board of Directors of the Terminal Company, or from your orators, built spur tracks from a connection with the tracks of the Terminal Company to industries located adjacent to said tracks, and now claim such spur tracks belong to themselves or some corporation organized and controlled by them; that since the building of such spur tracks, continuously and now, the said defendants, the Hubbells, switch and haul cars from the tracks of the Terminal Company over said spur tracks, using the switch engines and motive power and the employees of the defendant corporation to do such switching (at the cost and expense of your orators). And the said Hubbells, themselves, or in the name of their said corporation, collect from all railroad companies, including your orators, an extra charge of $——— per car, and appropriate such collections or switching charges to their individual use and benefit, or to the use and benefit of their said corporation.

"That such spur tracks at their initial point are each and all laid for some distance upon the ground which was acquired and is held by the Terminal Company, as is hereinbefore charged, and such spur tracks in some instances are laid in the streets or alleys of the City of Des Moines where permission was granted to the Terminal Company, defendant, by the city council of said city. That your orators are not advised and cannot state the cost or value of the ground occupied outside of said streets and outside of the ground held by the defendant corporation as trustee for your orators as hereinbefore charged.

"And your orators represent and show to the court that in good faith and in equity said spur tracks should either be conveyed to the defendant corporation for the reasonable cost of constructing the same, including right of way, or that the part of the same that has been laid upon the ground of the Terminal Company should be taken up and removed.

"And your orators state that they are willing that said tracks and connection may remain, provided such spur tracks and the right of way upon which they are laid be conveyed to the Terminal Company, and they are willing that the said Terminal Company reimburse the defendants Frederick M. Hubbell and Frederick C. Hubbell, or their said corporation, for the reasonable cost and expense of constructing said spur tracks, including right of way and legal interest therein, after an accounting for the amounts received for switching over the same as hereinbefore stated. And your orators here and now offer to do and perform whatever this Court determines is equitable and just as a condition precedent to the conveying of said spur tracks and right of way and turning over of the same to the Terminal Company."

While there were assignments of error in this court covering the questions raised by paragraph 37, there was no decision thereon, nor did the Supreme Court consider the same.

After the decision in that case representatives of the Union, the Milwaukee, and the Wabash Companies on the one hand, and the Messrs. Hubbell on the other, made an attempt to agree upon terms for a lease for fifty years of the Terminal Company facilities to the Union Company. Controversy arose over the question of who should pay the taxes, and the lease was not made. The Terminal Company then leased its properties to the Chicago Great Western and the Chicago, Burlington & Quincy Railroad Companies, and the Terminal Company constructed additional tracks for necessary connections with said companies at an expense of some $12,000. Sufficient we think has been stated to show the nature of the present case. For further facts reference may be made to the opinion of this court in 254 F. 927.

The trial court in its opinion, after referring to certain legal decisions said:

"Based upon these rules of law there can be but one answer to the question whether or not the Messrs. Hubbell violated their trust in the building, owning and extending a system of tracks connected and joined directly or indirectly with the Des Moines Union system for their own benefit and profit; and in failing to extend the Des Moines Union for the purposes for which it was organized; and in constructing their own system as to bottle up, hinder and deny to the Des Moines Union power to extend farther their tracks into the factory district.

"In fact some of the acts of the Des Moines Terminal Company in extending spur tracks to a manufacturing plant or establishment, with their own funds, and charging the Des Moines Union for the use thereof, would hardly stand the scrutiny of a Court of Equity were the transaction had between private individuals."

We agree with this statement.

The Supreme Court of the United States in the former case (254 U. S. 212, 41 S. Ct. 81, 87, 65 L. Ed. 219) said: "Obviously the fiduciary character of the terminal company extended to its officers and directors as to all others concerned in its management, charging them with a duty to uphold the trust and imposing upon them the usual disability about reaping a personal advantage at the expense of the beneficiaries. * * * Mr. F. M. Hubbell was an officer and director of that company at the beginning and continuously thereafter, especially active in its management; and during a period which included the important transactions in question he also was a director and officer of each of the proprietary companies and their trusted representative in respect to terminal matters at Des Moines."

The Hubbells thus, by the language of the Supreme Court of the United States, were held to be in a fiduciary capacity in relation to the Des Moines Union. The Supreme Court settled the question as to the Union Company holding property as a trustee for the proprietary roads. The relationship of Hubbell and his son as officers and directors of that company charged them with all the duties and obligations arising from a fiduciary relationship. It was their duty to develop the business of the Union Company according to the purpose of its organization, as evidenced by the contract of 1882 and the articles of its incorporation. Such was evidently Mr. Hubbell's purpose in the early life of the Union Company, as is apparent from the language of two deeds for right of way purposes made by him to the Union. The first, dated October 1, 1895, is for right of way for track designated as No. 87, and contains this provision: "The above-granted right of way is granted only for the construction, maintenance and operation of a sidetrack and not for a main track. Said track is to be laid, maintained and operated upon said premises so that the Des Moines Union Railway Company can obtain access to manufactories, warehouses and other industries located upon the land belonging to said Hubbell in said section 9, township 78, range 24, and it is not to be used as a sidetrack for general railway purposes, save in such manner and at such times as will in no way interfere with its use as a sidetrack for the accommodation of manufactories, warehouses and other industries located upon the aforementioned land belonging to said Hubbell, and it is expressly understood and agreed that the right of way herein granted is limited to the purposes and for the objects hereinbefore set forth." (Taken from appellant's brief in No. 8992, not being set out fully in the record).

The second, dated April 1, 1899, was for the 2,000-foot strip and contains this covenant: "The above-granted right of way is a right of way only for the construction, maintenance and operation of a sidetrack, and not for a main track. Said track is to be laid, maintained and operated upon said premises so that the Des Moines Union Railway Company can obtain access to manufactories, warehouses or other industries located upon said lots fifty-seven (57), fifty-

eight (58) and fifty-nine (59), said official plat, and it is not to be used for any other purpose than as a sidetrack, and it is not to be used as a sidetrack for general railway purposes, save in such manner and at such times as will in no way interfere with its use as a sidetrack for the accommodation of manufactories, warehouses or other industries located upon the aforementioned lots, and it is expressly agreed and understood that the right of way herein granted is limited to the purposes and for the objects above set forth." (Taken from appellant's brief in No. 8992, not being set out fully in the record.)

 It is contended by counsel for the Terminal Company that the individual property of officers and directors acquired before the trust relation cannot be impressed with a trust. While it is not clear in this case that all the property in the factory district owned by the Hubbells was acquired before the Union was incorporated, and while the evidence tends to show that a part of it was acquired thereafter, we do not think this of any particular importance. Ordinarily, as claimed, Mr. Hubbell could do what he chose with his property acquired prior to the fiduciary relationship, but he could not use his property so acquired to assist in violating the duties which he owed to the Union Company as a fiduciary officer thereof. Contracts of course may be made between individuals interested in a corporation and the corporation and which do not secure any unwarranted advantage to such individuals. The question of good faith is the test. Jones v. Missouri-Edison Electric Co. et al. (C. C. A.) 144 F. 765; Cowell v. McMillin et al. (C. C. A.) 177 F. 25; Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

This is not the situation of an ordinary transaction between a corporation and its officers. There is a trust relationship here. Mr. Hubbell could not do as he pleased with his property so as to relieve himself of his duties and obligations as a fiduciary. There is nothing in Wyman v. Bowman (C. C. A.) 127 F. 257, 273, antagonistic to this doctrine, where the court said: "Contracts and transactions between individuals and corporations of which they are directors or officers, which are fair, which are made in good faith, which do not secure to the individuals any undue or unjust benefit or advantage, and in which the interest of the individuals and the duty of the officials work in unison for the welfare of the corporation, are valid and enforceable both at law and in equity." We are unable to see why he could not use the property he 

might have acquired subsequent to the incorporation of the Union Company to break it down, but could so use the property acquired before. If the Hubbells were not willing because of some disagreement as to the use of surplus earnings in the construction of tracks to conserve and advance the interest of the Union Company, it was their duty to resign from their offices in that company, as suggested in the letter of Mr. Ramsey, Jr., president of the Wabash, to Mr. F. C. Hubbell in 1902, as follows:

"You ask me to state candidly what the objections are to your position. I will give them as requested, candidly: You are the President of the Des Moines Union and as such President you have no right officially or personally to encourage, aid or abet in the slightest manner the construction or development of any other terminal company in the city of Des Moines. If you wish to do so, you should resign your position of President and allow someone, whose sole interest would be that of the Des Moines Terminal and the protection of the rights of the tenant companies under the contract existing between the Des Moines Company and the tenant lines.

"Yours very truly,
"J. Ramsey, Jr., President."

We animadvert to the circumstances surrounding the organization of the Terminal Company. Controversy had arisen between the Hubbell interests in the Union and the proprietary roads as to the expenditure of surplus earnings for the purchase of switch engines and the building of certain tracks. The proprietary roads did not object to the improvements, but to the application of surplus earnings toward payment therefor. Their position was that additional tracks should be built out of capital investment. This surplus fund the Supreme Court later held to belong to the proprietary roads. There is no evidence that the proprietary roads objected to expansion of the Union Terminal system. When, at one of the directors' meetings, it was reported that some $24,000 of surplus earnings had been used for payment of two switch engines, shares in a transfer company, and building a switch track, the proprietary roads objected, but stated: "We do not protest against these improvements but against the application of earnings toward payment thereof." The controversy over payments out of surplus earnings was probably the cause of the Hubbells organizing the Terminal Company. They were not frank about it, but apparently arranged to develop a rival company and

impart as little notice of it as possible to the proprietary roads. Mr. Hubbell in 1901 wrote Mr. Ellsworth, who was projecting the Des Moines, Iowa Falls & Northern: "We have practically decided to organize the Des Moines Terminal Company to build this line in South Des Moines; that is to say if you and the Chicago Great Western wish us to do so, and our Articles of Incorporation have already been prepared. This is confidential. Please let me hear from you as soon as you hear from Mr. Stickney." No mention was made of the Terminal Company in meetings of directors of the Union prior to the meeting of 1906. Mr. Wagner, superintendent of the Union, did not know for a year and a half after its organization that the Terminal was organized. April 25, 1906, F. C. Hubbell wrote the general manager of the Chicago Great Western as follows: "It is the intention of the Des Moines Terminal Company to own all of the tracks in the neighborhood in question, and if the Great Western desires to occupy the tracks of the Des Moines Terminal and switch upon them in the same manner that they have in the past occupied the tracks of the Des Moines Union, we will have no difficulty in arriving at a basis for you to use them."

April 26, 1907, Mr. J. A. Wagner, superintendent of the Union Company, wrote Mr. F. C. Hubbell: "When they call on us, to inspect Des Moines Union property, I presume all I should show them is Des Moines Union, proper, and nothing concerning Des Moines Terminal. I would like to have this information, so, if it comes up, when you are absent, I will know how to be guided." This reference seems to be to officers of the Milwaukee or Wabash Companies.

As an example of unfair conduct towards the Union Company, we refer to the letter of Mr. Wagner after a new track had been constructed by the Union into the Des Moines Bridge Company. He wrote Mr. F. C. Hubbell August 29, 1905: "This sand was put under the west end of the Des Moines Bridge Co.'s new track, which we built south of our main line, your father stating that Hutchins owed him, and he thought he could get four or five cars of sand to make this fill. This was at the time when it was not decided whether this track should belong to the Des Moines Terminal or Des Moines Union. I do not see how I can take care of this charge in our track department. Perhaps I could handle it by making a trade with Des Moines Terminal for the dirt which we have put in on the Garrison and Smith-Lowe tracks." This

letter shows the general method of passing around the ownership of the tracks. These letters show a certain lack of frankness that should not characterize the actions of those in a fiduciary position.

The picture presented by this record shows the president of the Terminal Company, F. M. Hubbell, who was the controlling influence therein, dealing with his son, F. C. Hubbell, as president of the Union Company, of which the father was secretary and a director, and also the controlling influence in making contracts and leases between these companies, mingling their properties, building up the Terminal Company at the expense of the Union Company, permitting the Union Company to own only one track in the district constructed after 1902, bottling it up effectively, secretly arranging with railroad companies to use the Terminal Company tracks, disposing of tracks built by the Union Company to the Terminal Company without knowledge of the proprietary companies, securing large sums from trackage charges over roads the Union should have owned, setting themselves up in business in the very field in which the Union Company was organized to operate, putting themselves in a position antagonistic to the Union Company, of which they were fiduciary officers, and threatening the very purpose of its organization in order to reap a profit for themselves.

Was this carrying out the decision of the Supreme Court in 254 U. S. 196, 41 S. Ct. 81, 65 L. Ed. 219, where it had clearly stated that the Union Company was bound to exercise all its powers, even the power of renewal of the charter, in furtherance of the trust? On the contrary, it was doing the very thing the Supreme Court said could not be done. The justification therefor is the plea that these officers could do as they chose with their own property.

This court said in Trice v. Comstock, 121 F. 620, 624, 61 L. R. A. 176, where an agent, who secured knowledge by virtue of his agency, bought the land for himself instead of his principal: "The law imposed upon this agent, Comstock, the duty to use all the knowledge and all the benefits he derived from his agency to accomplish the purpose of his principals, and it implied an agreement on his part that he would faithfully discharge this duty. It forbade him to use them for his sole benefit or to prevent his principals from obtaining the object of the agency, and charged everything which he acquired by a violation of this inhibition with a construc-

tive trust for their benefit. * * * He was prohibited from using the information and advantages he had secured by means of his agency to prevent or hinder his principals from accomplishing the purpose of the agency. His disability extended to all land by the purchase of which through the information and benefits he had derived from the agency he would hinder or obstruct his principal's business of buying and selling lands in Missouri." Again, in Iroquois Iron Co. v. Kruse, 241 F. 433, this court reiterated this rule of equity. From the syllabus we quote: "When one person is placed in such relation to another that he becomes interested for or with him in any property or business, he is in such fiduciary relation with him as to be prohibited from acquiring rights in such property or business antagonistic to the person with whose interests he is associated and if, in violation of this inhibition, he acquires any property or interest by means of interest or information acquired through the fiduciary relation, thereby preventing or hindering his associate in accomplishing the object of the agency, the property thus acquired is charged with a constructive trust for the benefit of his associate." In Keith v. Kellam (C. C.) 35 F. 243, 245, Judge Brewer said: "Happily the law speaks with no uncertain sound in answer to this question. In letters that are golden, and that shine upon every page, it affirms that one who has established such confidential relations must be absolutely loyal to that confidence. It is not enough that direct misrepresentation is avoided. Concealment and silence are fraudulent, and that, too, although they may not be with conscious intent to defraud,—a silence from carelessness and neglect."

We quote from Pomeroy's Equity (3d Ed.) §§ 1075 and 1079:

"Absolute and most scrupulous good faith is the very essence of the trustee's obligation. The first and principal duty arising from this fiduciary relation is to act in all matters of the trust wholly for the benefit of the beneficiary. The trustee is not permitted to manage the affairs of the trust, or to deal with the trust property, so as to gain any advantage, directly or indirectly, for himself, beyond his lawful compensation. * * *

"1079. It is well settled that every violation by a trustee of a duty which equity lays upon him, whether willful and fraudulent, or done through negligence, or arising through mere oversight or forgetfulness, is a breach of trust. The term therefore includes every omission or commission which violates in any manner either of the three great obligations already described: of carrying out the trust according to its terms, of care and diligence in protecting and investing the trust property, and of using perfect good faith."

Corpus Juris, vol. 2, p. 692, 693: "General Rule. The relation of an agent to his principal is ordinarily that of a fiduciary, and as such it is his duty, in all dealings concerning or affecting the subject matter of his agency, to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. So sedulously is this principle guarded that all acts of an agent which tend to violate his fiduciary duty are regarded as frauds upon the confidence bestowed, and are not only invalid as to the principal, but are also against public policy."

From C. M. & St. P. Ry. Co. et al. v. Des Moines Union Ry. Co. et al., 254 U. S. 196, 212, 41 S. Ct. 81, 87, 65 L. Ed. 219, we quote: "And it is clear and undisputed that the Messrs. Hubbell acquired their stock with full notice of all essential facts pertaining to the trust; they themselves at all times material were officers and directors of the terminal company and acted in a fiduciary capacity in everything relating to its affairs."

The proprietary roads had a right to claim that, as long as the Hubbells and Thompson were the guiding officials of the Union Company controlling five-eighths of its stock in the period from 1893 to 1921, and acting in a fiduciary capacity, it was their duty to build up that system by extending its lines and business into the field contemplated by the contract of January 2, 1882, and its articles of incorporation. A trustee may be guilty of a breach of trust in what he does not do as well as in what he may do.

We agree with the finding of the trial court that the Messrs. Hubbell violated their trust in developing the Des Moines Terminal system as antagonistic to the Des Moines Union and the proprietary roads for their own benefit and profit and in failing to develop the Des Moines Union for the purposes for which it was incorporated.

We are satisfied that the Terminal Company was merely the alter ego of the Hubbells. From its organization the stock was owned by the Hubbells and Thompson, or interests controlled by them. It had no engines or equipment to operate its trackage, and relied on the Union for these things. What it did up to 1921 was as a mere agent

or instrumentality of the Hubbell interests. This court said in Majestic Co. v. Orpheum Circuit, Inc., 21 F.(2d) 720, 724: "The corporation will be regarded as a legal entity as a general rule, and the courts acting cautiously and only when the circumstances justify it, will ignore the fiction of corporate entity, where it is used as a blind or instrumentality to defeat public convenience, justify wrong, or perpetrate a fraud, and will regard the corporation as an association of persons." Hunter v. Baker Motor Vehicle Co. et al. (D. C.) 225 F. 1006; Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

If there were nothing further to this case than what we have so far discussed, we should hold that the rights of way, tracks, and railway properties claimed to be owned by the Terminal Company constitute a part of the trust estate of the Union Company for the use of the proprietary companies and should be transferred upon payment of legal compensation therefor. However, we are unable to so hold, for the conclusion is unescapable that the Union Company and the proprietary companies have waived the claim now asserted by them that they are in equity entitled to the ownership of the Terminal properties. We pass to a consideration of that question.

The trial court stated in its opinion that: "The Des Moines Union and the proprietary companies are not in a position now to claim that the laying of these tracks by the Des Moines Terminal Company upon Des Moines Terminal Company property, or the renting of the tracks laid on Des Moines Terminal Company property to the Des Moines Union amounted to a dedication of such property to the Des Moines Union, or was so impressed with a trust as to amount to ownership thereof by the Des Moines Union." The court was of the opinion from the evidence that the proprietary roads had general knowledge of the activities of the Hubbell interests in extending and joining the Des Moines Terminal Company tracks to the system of the Des Moines Union.

Counsel for the Union Company et al. insist that the plan and purpose of the Hubbells to set up a rival terminal company was fraudulently concealed from the proprietary roads, and that the evidence fails to show that the executive officers of the Milwaukee or Wabash Company had any knowledge or notice of the fact that the Des Moines Ter-

minal Company was a Hubbell enterprise until after they came into possession of the records of the Union Company upon the entry of the decree in the original case on April 5, 1921; that there was disclosed for the first time the fraudulent conduct of the Hubbells and Thompson, and that shortly thereafter they filed their supplemental petition in the original suit, which is in all substantial respects as their cross-petition herein; that by carefully worded letters, such as those referring to the excavations at Allen's Bluff and the building of the Dike track, the Hubbells attempted to prevent the officers of the proprietary roads from knowing the true situation of their connection with the Terminal Company; that in these letters no mention was made of the fact that the Hubbells and Thompson were interested in the Terminal Company; that bills for the Dike track were made on the trustee of the Hubbell estate, or F. M. Hubbell Son & Co. by the Union Company for materials and labor furnished by it; that the Terminal was not billed directly, in pursuance of the policy of secrecy, and emphasis is placed on a letter, heretofore referred to, from Mr. Wagner to Mr. Hubbell, concerning the showing of the properties, and also the letter from F. C. Hubbell to Mr. Ellsworth, which we have in part set out.

While there is some basis for the argument as to secrecy, yet the facts disclosed by this record do not in our judgment warrant a conclusion that the secrecy attempted to be practiced during the planning of the new company continued after the organization of the same to such an extent as to deceive the officers of the proprietary companies as to the Hubbells' interest in the Terminal Company. The articles of incorporation of the Terminal Company, a matter of public record, showed the relationship of the Hubbells thereto. Paragraph 37 of the amended bill of complaint in equity suit No. 4001, filed in 1909, recited that certain tracks had been constructed by the Hubbells contrary to the trust reposed in them, and relief is asked in the amended bill of complaint concerning these tracks. An assignment of error was presented on appeal to this court predicated upon the alleged error of the District Judge in denying relief as to the matters in said paragraph 37 and the sixth subdivision of the prayer for relief. We may digress here to say that these issues do not seem to have been mentioned by this court or the Supreme Court in their opinions. As the judgment of this court was reversed by

the Supreme Court and the case remanded to the District Court for further proceedings, the issues raised by said paragraph were not decided, and there is no estoppel by res judicata with reference thereto. "A judgment of reversal is not necessarily an adjudication by the appellate court of any other than the questions in terms discussed and decided." Syllabus, Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 24 S. Ct. 538, 48 L. Ed. 788.

In November, 1905, the Terminal Company made charges and bills against the Wabash and Milwaukee Companies for rental for switches and trackage. In 1907 the Wabash Company filed with the Interstate Commerce Commission and the Iowa board of railroad commissioners its tariff showing industries located upon the Des Moines Terminal. Letters appear in the record which, while not stating exactly the relationship of the Hubbells to the Des Moines Terminal Company, would certainly convey some information to experienced railroad men as to the situation. The board of directors of the Des Moines Union Company in 1906 considered the question of constructing a proposed line to the army post at Des Moines, and it was stated at the meeting that the Terminal Company would undoubtedly undertake the work if the Union Company did not. It is hardly to be supposed that no inquiry as to the status of the Des Moines Terminal Company would have been made. Under an amendment to the articles of incorporation of the Union Company adopted in 1890 extension of property could be made only by the unanimous action of the eight members of the board of directors. The proprietary roads having three directors must be held to have been cognizant of what took place at the meetings of the board.

In January, 1921, the proprietary roads made a complete examination of the books of the Union Company, and full information was given as to the maps and plats of the Terminal properties. That must have disclosed many facts concerning that company. It would have been impossible for the Hubbells to conceal their connection with the Terminal Company. A great system of terminal tracks cannot be constructed in secret. The officers of the Wabash and the Milwaukee Companies must have known of the situation. Undoubtedly they did not realize that the Hubbells had any intention by the construction of the terminal to use it eventually to weaken and cripple the Union Company in the factory district.

After the entry of the final decree in the former case, April 5, 1921, there was a stockholders' and directors' meeting of the Union Company. An executive committee was chosen and by motion "was authorized to negotiate such operating and other agreements for the Company as to them seemed necessary and report to the board." The Hubbells at that time had been displaced as officers and directors of the Union Company. In pursuance of this action, and having full knowledge of the situation, as they must have had, high officials of the Milwaukee and Wabash Companies, including the presidents of both, entered into negotiations with the Hubbells as officers of the Terminal Company for a fifty-year lease of the Terminal Company properties.

■ We have carefully examined and studied the record as to this most important and controlling matter on this feature of the case. A number of meetings were held both in Des Moines and in Chicago, and much time was given to a consideration of the situation. The representatives of the Union, Milwaukee, and Wabash Companies agreed with the Hubbells upon all the terms of a lease except as to who should pay the taxes upon the Terminal Company's properties. The officers of the proprietary companies made no claim to ownership, either legal or equitable, of the Terminal Company's properties. The negotiations broke up over the question of taxes. The proposed lessees refused to pay taxes as a part of the rental and insisted that the Terminal Company should pay the taxes on its properties. We can see no explanation of this course of conduct, unless it might possibly be to avoid a lawsuit, but it seems to us that it was a complete recognition of the ownership of the Des Moines Terminal Company of these properties, and that, taken in connection with the failure to insist in the former case on action upon the matters in paragraph 37 of the amended bill of complaint, the failure to reserve the question in the decree in the former case, and other circumstances, is sufficient to warrant the holding of the trial court that the Union, Milwaukee, and Wabash Companies cannot now assert ownership in the Terminal properties.

How does that leave this case?

The trial court evidently of the opinion that there was a difference in a claim of ownership and a claim of right to use, and that equity should afford some relief for a situation such as here presented, held that the waiver of claim to ownership was not inconsistent with an implied agreement and

understanding that, in consideration of the Des Moines Terminal Company joining its tracks with and using the facilities of the Des Moines Union, the latter should have the exclusive use of such tracks upon reasonable terms. It said: "The implied parol contract and arrangement here was that the Des Moines Terminal Company should have the right to extend the system of tracks of the Des Moines Union in the factory district owned by the Hubbell interests, and in consideration of the right to the use of the facilities of the Des Moines Union, and to join and connect their tracks with the Des Moines Union system, that the Des Moines Union should have the exclusive use of such tracks on reasonable terms. This contract should be enforced and the relationship returned as far as may be to the status quo prior to the lease by the Des Moines Terminal Company to the intervening roads." The trial court pointed out that the attorneys for the Terminal Company had urged that "the exclusive right by the Des Moines Union to use the tracks to the industries was a part consideration for the right to build the tracks by the Des Moines Terminal Company."

Counsel for the Terminal Company insist that the court attempted to establish a trust by parol evidence, and, further, that the doctrine of estoppel and laches applies to any claim to the use of the tracks and properties of the Terminal just as much as to a claim of equitable ownership thereof.

 That an express trust cannot be established by a parol agreement is the doctrine of the Iowa courts. It is provided by the Code of Iowa 1927, § 10049, that declarations or creations of trusts or powers in relation to real estate must be executed in the same manner as deeds of conveyance, but that such provisions do not apply to trusts resulting from the operation or construction of law. The Iowa statute is not applicable, as the trust here is a constructive trust.

It is held by the Iowa Supreme Court that this inhibition of the statute as to parol is a rule of evidence, and that, if the trust is established by other evidence, it will be enforced. Johnston v. Jickling, 141 Iowa, 444, 119 N. W. 746. From the syllabus of this case we quote, as it also bears on another question urged, viz., the statute of frauds: "Neither the statute of frauds nor Code § 2918, providing that 'declarations or creations of trusts or powers in relation to real estate must be executed in the same manner as deeds of conveyance, but this provision does not apply to trusts resulting from the operation or construction of law,' declares a parol trust invalid; such statutes referring to the character of evidence which must be adduced as against the holder of the legal title, and, if the trustee admits the trust or if the parol trust has been fully carried out and executed, the statute does not apply." The trust relationship here, however, does not rest on parol evidence. It results from all the circumstances, and comes within the second division of the rule as stated in 26 Ruling Case Law, p. 1170: "5. Kinds and Divisions.—Trusts may be classified into two general divisions: (1) those trusts which arise out of a direct or positive declaration of trust, and known as direct or express trusts; and (2) implied trusts or trusts enforced by equity because morality, justice, conscience and fair dealing demand that the relation be established."

 The question of laches is one of importance. Cross-petitioners knew as early as 1906 of the existence of the Terminal Company, and that it was acquiring lands and building tracks in the factory district. In 1909 they filed their amended bill in equity suit No. 4001, containing paragraph 37, hereinbefore discussed, which shows some knowledge of the situation then existing. Even, however, if they did know that the Terminal Company was acquiring rights of way and building tracks and being paid $1 a car by the Union Company for cars switched over the Terminal Company tracks, can it be assumed that they had any knowledge that the Terminal Company would exclude the Union Company from the use of the tracks and destroy the unified terminal system in the factory district? There was evidently some delay in prosecuting the original case, and of course the mere filing of a suit does not relieve one from charge of laches if it is not diligently prosecuted. Northrup v. Browne (C. C. A.) 204 F. 224; Taylor v. Salt Creek Consol. Oil Co. (C. C. A.) 285 F. 532. Laches is an inexcusable delay in asserting rights. Mere lapse of time does not constitute laches. To await an unreasonable time before seeking relief from a known wrong may amount to laches. It is to be determined by consideration of justice, and that is dependent upon the circumstances of each particular case. Cross-petitioner always claimed the right to the exclusive use of the tracks. That was never waived. The pertinent inquiry is made by counsel for the Terminal Company as to why, if the Union Company had the right to the use of the property, should it seek a lease. The answer, we

think, is that the proprietary companies were trying to get the right to use established by a lease instead of resorting to a lawsuit—a much more desirable way. On the general subject of laches, see Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 36 L. Ed. 738; Abraham v. Ordway, 158 U. S. 416, 15 S. Ct. 894, 39 L. Ed. 1036; Southern Pac. Co. v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099; Minnesota Mut. Inv. Co. v. Mc-Girr et al. (C. C. A.) 263 F. 847; Taylor v. Salt Creek Consol. Oil Co. et al. (C. C. A.) 285 F. 532. The Supreme Court said in Chicago, M. & St. P. Ry. Co. et al. v. Des Moines Union Railway Co. et al., 254 U. S. 196, 220, 41 S. Ct. 81, 90, 65 L. Ed. 219: "Convinced that the relation of the parties was fiduciary and not merely contractual, we are unable to accept the view thus outlined. It would require a clear case to warrant a court of equity in declaring that the trustees of an express trust, in the very course of their administration of the trust, had acquired a dominant interest in the trust property and in effect a discharge of the trust, through mere inattention or even negligence —not raising an estoppel or amounting to laches—on the part of the parties beneficially interested, or of their executive officers. Conduct merely equivocal, or apparently inconsistent with a vigilant insistence upon the obligations of the trustee, is not sufficient to discharge a trust. The cestui que trust is entitled to rely upon the fidelity of the trustee, until plainly put on guard against him. And the trustee is at all times disabled from making a profit for himself out of any dealings in the trust property without the express consent of the cestui que trust." And the court further said, page 222 of 254 U. S., 41 S. Ct. 81, 91: "It seems to us the court below attributed undue weight to the conduct of the executive officers of the proprietary companies indicating acquiescence in a supposedly changed situation resulting from the amended articles. It would not be surprising if occasionally there was a failure to appreciate fully and accurately the rights and obligations growing out of the trust. But the Messrs. Hubbell, because of their fiduciary relation, are estopped from laying hold of the incautious, negligent or mistaken acts of the executive officers as a ground on which to build up a profit or advantage for themselves at the expense of the proprietary roads which were their cestuis que trustent."

We are not willing to hold, under the circumstances of this case, that, even though cross-petitioners had waived their right to claim the equitable ownership of the Terminal Company's properties, by laches they had lost the right to claim the exclusive use of said properties as a part of the Union's terminal system, whether such right arose from the trust relationship or from an implied contract. The doctrine of laches, if so applied, would not be in the interest of justice and fair dealing, but quite the contrary. The proprietary roads might be excused for some dozing on their rights, believing they had sentinels on guard in the persons of the officers of the Union Company who would care for their interests. They could rely on their fidelity until otherwise advised. In view of the manifest breach of duty as fiduciaries, the Hubbells are not in the best position to invoke the equitable doctrine of laches.

It is insisted that the relief granted by the court is beyond the purview of the complaint and not within the issues and prayer of the cross-petition. Of course the Union was claiming the ownership of the properties, not merely the right to use them. Use was involved in the claim of ownership. However, the prayer of the petition was for general relief, and it was within the power of the court, consistent with the evidence, to grant general equitable relief, and, where there is a prayer for general relief, the court may grant any relief consistent with the pleadings and evidence if it have jurisdiction. Minnesota Mut. Inv. Co. v. McGirr et al. (C. C. A.) 263 F. 847; Levy v. S. H. Kress & Co. (C. C. A.) 285 F. 836; Tayloe v. Merchants' Fire Ins. Co., 50 U. S. (9 How.) 390, 13 L. Ed. 187; Lockhart v. Leeds, 195 U. S. 427, 25 S. Ct. 76, 49 L. Ed. 263.

The question raised, whether the rights of way under short-term leases from the Hubbells to the Union Company, which have now expired, can be impressed with an equitable easement for the future maintenance of the tracks thereon, is a serious one.

The court sets forth in division II of the decree the various rights of way involved, and in division X adjudges: "That the defendant, Des Moines Union Railway Company is entitled to have the several railway tracks and each of them described in division II hereof, and located in the Factory Addition, perpetually maintained upon the respective rights of way now occupied by them, except that in the event the industries being served by any one of said tracks shall be moved to another part of the premises, necessitating the shifting of such track to accommodate such industries, then the same may be shifted to a new right of way to accommodate that industry, but not so as to interfere with the

rights of the defendants to adequately serve such industries or any other industries located on such track, and the expense of such change shall be borne by the party for whose benefit it is made."

Certain rights of way in the factory district were secured by deed from F. M. Hubbell to Des Moines Union Railway Company, such as that to the 100-foot strip, heretofore referred to, the strip leading easterly from the 100-foot strip upon which track 87 was constructed, and the 2,000-foot strip. Other rights of way for periods of one to ten years were secured by leases executed by F. M. Hubbell & Son to the Union Company prior to the organization of the Terminal Company, and tracks were constructed thereon. The rental was nominal. These leases were signed by F. M. Hubbell, as grantor, and F. C. Hubbell, as president, of the Union Company. It is earnestly argued that as to all these leases the rights thereunder have expired. A clause is found in these leases that the contract of lease shall expire at a certain date "if new arrangements have not been made for the continuance of the permit." After the leases expired, the Union Company continued to use all these rights of way up to April, 1921, and to operate the tracks located thereon. Numerous extensions and renewals have been made of the leases, and the rights under the clause quoted have not been exercised; hence it is within reason to assume that some kind of arrangements for occupancy of these rights of way have been made by the Hubbell interests.

◼ It is apparent that the whole terminal system was constructed as a permanent and unified one. The Hubbells were not dealing at arm's length with the Union Company in leasing these rights to them, and, where the Union Company has gone ahead and operated all these years after the leases have expired, the Hubbell interests should not now be permitted to say that no easement has been acquired under which the Union Company is entitled to maintain and operate these tracks for the benefit of the proprietary companies on the rights of way originally leased to it as long as needed for railroad terminal purposes. There was evidently no intention upon the part of the Hubbells to require the removal of the tracks upon expiration of the leases. They have not done so. The original intention of the Hubbells is manifest by the letter of F. C. Hubbell to J. Ramsey, Jr., president of the Wabash Company, written in May, 1900, as follows: "The fact that we (the Hubbell interests) stand ready to fur-nish the Union right of way free in our manufacturer's addition * * * is the main reason that the Des Moines Union Railway is coming so fast into prominence at Des Moines." The intent that the Union Company system should be of a permanent nature is shown by all the circumstances and conditions surrounding the construction of these tracks and the long and continued maintenance and use thereof after the temporary leases had expired. If the executive officers of the proprietary roads had some knowledge of the short-term leases, by the same token they would have known the provisions thereof to remove tracks had never been insisted on by the lessor interests, and that the use had gone on for years with no effort of the Hubbells to terminate it.

We are satisfied that the Union Company is entitled to claim an equitable easement in these rights of way originally leased to it by the Hubbell interests to use the same in maintaining tracks to the industries in the factory district as long as necessary for the purpose upon payment of reasonable compensation therefor. Otherwise the rights of the Union in the factory district would be practically destroyed.

◼ The trial court held that the interveners were bound to know that the Union Company was in actual possession and use of the property of the Terminal Company at the time of the execution of their lease; that they were put on inquiry and required to use reasonable diligence to ascertain the rights of the Union Company. The entire switching upon the Terminal Company's tracks was done by the Des Moines Union. The Terminal had no engines or cars. It must have been apparent to any one that the Union Company had some sort of possession of the Terminal Company properties. The interveners made no inquiry as to the rights of the Des Moines Union from any officer thereof. If they had they would without doubt have discovered that the Des Moines Union was claiming the ownership of the tracks or at the least the right to their use.

The general manager of the Great Western Company testified that he was familiar with the contract between the Union and the Great Western under which the Great Western had had the right to some operation over the Union tracks, but which gave no right to operate over the Terminal tracks. That he participated in the proceedings resulting in the joint lease to the Great Western and Burlington Companies; that he had been advised of the negotiations between the Hub-

bells and representatives of the Milwaukee, Wabash, and Union Companies with respect to a lease of these terminals; that he knew the tracks of the Terminal Company were being operated by the Union Company, but that Mr. F. M. Hubbell felt that he would be able to straighten the matter out so as to give lessees access to all the tracks of the Terminal Company. He made no inquiry of any official of the Union Company as to what its rights were. Mr. Frank Johnson, assistant to the operating vice president of the Burlington Company, testified he was familiar with the situation as to the Union Company and its connections prior to the lease; that he knew the Union Company was operating the Terminal tracks, and that the Union had been switching for the Burlington to and from industries on the Terminal tracks, and was a tenant as to its passenger business into Des Moines, and Mr. Hubbell stated to him about the same thing that he stated to the manager of the Great Western as to reaching tracks of the Terminal Company then segregated. He made no inquiry of any of the officials of the Union Company or the proprietary roads.

The letter of June 21, 1921, signed by the president of the Great Western and Burlington Companies, to the chairman of the Interstate Commerce Commission, indicates that interveners had rather complete knowledge of the situation. The letter states: "For the information of the Commission, it may be stated that the trackage covered by the contract has been operated for a number of years by the Des Moines Union Railway Company. The Des Moines Terminal Company and the Des Moines Union Railway Company have been owned and operated by the same private interests for many years. A recent decision by the United States Supreme Court vested ownership in the Des Moines Union Company, in the Chicago, Milwaukee & St. Paul Railway and the Wabash Railway, and as the Des Moines Terminal had never been an operating company, it devolved upon the owners to arrange for the operation of these tracks by some railroad reaching Des Moines · so that the industries located thereon might receive adequate service."

The possession of the Union Company of the tracks of the Terminal was complete, open, and notorious enough in our opinion to give notice that the Union Company had rights thereon, and it is significant that no effort was made by the lessee companies to ascertain from the Union Company what

rights it claimed. While it is probably true that they might not have discovered that the Union was claiming or would claim an equitable trust in the use of the properties distinct from the ownership, they would have learned that the Union Company did claim an interest in the property and denied any right of the Terminal Company to take from it the right to the exclusive use of said tracks.

It is insisted that under the decree of the court both the legal and the beneficial interest are in the Terminal Company, and hence that no trust is created. That a trust cannot exist where the legal and beneficial interest are in the same party is settled doctrine. 26 Ruling Case Law, 1186. That question arises here because the court held the Terminal Company was entitled to compensation from the Union Company for the use of its properties; hence the suggestion that the Terminal Company really retains the use thereof. The Union Company's answer to this is that the compensation is for services and reimbursements made for the benefit of the trust estate. The beneficial estate is the right to the use of the property. That is in the Union Company by decree of the court. The compensation to be allowed is payment for the beneficial interest which the Terminal Company has been compelled to part with. Services rendered and investments made for the benefit of the trust estate may be taken into account in determining the value of the right of the use for which compensation is to be made. The Terminal Company receives a consideration for parting with the beneficial interest. Such interest does not remain in it. Whatever the right to the use may be termed it is in fact in the nature of an easement.

Some other legal questions have been raised which we have considered but which we think unnecessary to discuss.

We understand the court's decree in holding the railroad properties of the Terminal Company to be held in trust for the exclusive and perpetual use of the Union Company to mean as long as necessary to be used for railroad purposes in the factory district. We think the trial court has worked out as equitable adjustment of a very difficult matter as is possible under the complicated condition of affairs, and that its decree should be affirmed. Mills Novelty Co. v. Monarch Tool & Mfg. Co. (C. C. A.) 49 F.(2d) 28; Linde Co. v. Morse Co. (C. C. A.) 246 F. 834. It is so ordered and this results in an affirmance as to each appeal.

Affirmed.